**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 27 2005**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

ARMOND EUGENE MOZEE,

      Defendant-Appellant.

No. 04-8015

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 03-CR-196-J)**

---

Robert R. Rogers, Assistant Federal Defender, Cheyenne, Wyoming, for Defendant-Appellant.

David A. Kubichek, Assistant United States Attorney (Matthew H. Mead, United States Attorney, with him on the briefs), Casper, Wyoming, for Plaintiff-Appellee.

---

Before **SEYMOUR**, **MURPHY** and **McCONNELL**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Armond Eugene Mozee entered a plea of guilty to a charge of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). At sentencing, Mr. Mozee's guidelines range was enhanced by four offense levels, pursuant to U.S.S.G. § 2K2.1(b)(5), on the basis of the district court's finding that Mr. Mozee possessed a firearm in connection with the commission of another felony offense. Incorporating the four-level enhancement, the court determined Mr. Mozee's guidelines range was 100 to 120 months and sentenced him to 120 months incarceration. Mr. Mozee advances several theories to support his contention that the district court erred in finding he possessed a firearm in connection with the commission of another felony. He also argues his Sixth Amendment rights were violated pursuant to *Blakely v. Washington*, 124 S. Ct. 2531 (2004). For the reasons stated below, we AFFIRM.

**I**

It is undisputed that on July 14, 2003, a loaded firearm in the immediate possession of Mr. Mozee was discharged. It is further undisputed that the bullet expelled from the discharge struck Mr. Mozee's former girlfriend, Susan Ferguson. The bullet entered her body at the upper left side of her back and exited from the middle of her right buttock. The factual circumstances leading up to and resulting in the shooting are in dispute. Of particular significance is the

-2-

question of whether the shooting was accidental or intentional in nature. Based on the facts stated below, the district court determined, by a preponderance of the evidence, that the shooting was intentional.

After the shooting incident, the Cheyenne Police Department (CPD) was notified that Ms. Ferguson had been admitted to the hospital suffering from a suspicious gunshot wound. Officer Radomicki and Detective Weese were the initial CPD investigating officers dispatched to the hospital. According to Officer Radomicki, Ms. Ferguson relayed a series of stories regarding how she had sustained her injuries, which ranged from being struck by a rock thrown from a passing car in the street to a drive-by shooting. When Detective Weese arrived at the hospital, he examined Ms. Ferguson's wounds where the bullet had entered and exited her body. He did not see any gun powder burn marks around her entrance wound (commonly referred to as "stippling" or "tattooing"), the presence of which is one method of determining whether the gunshot occurred at close range. After the examination, Detective Weese proceeded to the residence Ms. Ferguson shared with Mr. Mozee in Cheyenne, Wyoming.

Upon his arrival at the Ferguson-Mozee residence, Detective Weese met Mr. Mozee and questioned him regarding the shooting incident. Mr. Mozee's first version of events was nearly identical to the second story Ms. Ferguson had provided Officer Radomicki: that Ms. Ferguson sustained her injuries as a result

of a drive-by shooting. Detective Weese requested that Mr. Mozee accompany him to the CPD to discuss the matter further. Mr. Mozee agreed and, once the pair arrived at the CPD, the detective began a second interview.

Mr. Mozee elaborated on his initial version of events, again denying any involvement in the shooting. He said he first became aware of the shooting when he witnessed Ms. Ferguson lying on a couch in their residence with blood coming from the area of her back. He claimed he then called a friend, Vicki Hoffman, who resided in Loveland, Colorado, and requested she drive approximately 70 miles to Cheyenne to assist him with the situation. After Ms. Hoffman arrived from Loveland, she took Ms. Ferguson to the hospital.

Detective Weese did not believe Mr. Mozee and pressed him further. Mr. Mozee then said he had accidentally shot Ms. Ferguson while they were arguing in their home. He claimed he picked up his Colt .380 caliber handgun from a nearby table during the argument. While he was in the process of placing the gun in the waistband of his pants, where he routinely carried it, Ms. Ferguson grabbed his arm and caused the gun to sweep past her body. Mr. Mozee reported that the gun discharged during this "sweep," wounding Ms. Ferguson.

Detective Weese was not convinced by Mr. Mozee's story. His skepticism was principally fueled by his belief that the bullet's trajectory through Ms. Ferguson's body would have only occurred as it did if Ms. Ferguson was in a

crouching position with her head oriented toward her knees at the time of the shooting. After his interview with Mr. Mozee, therefore, Detective Weese returned to the hospital to speak with Ms. Ferguson. The detective informed her of the reason for his visit and she offered a third version of events. According to Ms. Ferguson, she and Mr. Mozee were arguing and, at some point, she turned to walk out of the door when she felt a sharp burn or pain in her lower middle back. Detective Weese said Ms. Ferguson told him that she was "getting out of the house, and I got shot." Rec., vol. IV at 24.

At Mr. Mozee's sentencing hearing, Detective Weese testified that while Ms. Ferguson's latest version of events was more consistent with the geometry of her wounds, her story still failed to fully explain the bullet's trajectory. The detective remained convinced that when the shot was fired, Ms. Ferguson was crouched down, leaning forward, and facing her shooter. On cross-examination, Detective Weese conceded that there were at least theoretically conceivable physical contortions two people in a struggle could achieve that might explain Ms. Ferguson's wounds. He also acknowledged that Ms. Ferguson had not characterized the shooting as either intentional or accidental; she simply said, "I got shot."

Vicki Hoffman also testified at Mr. Mozee's sentencing hearing. She reported that, upon her arrival at the Ferguson-Mozee residence, she observed Ms.

Ferguson's condition and asked Mr. Mozee what had happened. Ms. Hoffman initially testified that "he really didn't say anything," and "he just sat there." *Id.* at 26. Once pressed, however, she testified that Mr. Mozee responded: "[Ms. Ferguson] was fucking with me and wouldn't leave me alone." *Id.* at 27. Ms. Hoffman admitted that Mr. Mozee repeated this line several times before she finally took Ms. Ferguson to the emergency room.

The final witness at the sentencing hearing was Shirley Martinez, the victim-witness coordinator for the Wyoming United States Attorney's Office. She testified that Ms. Ferguson contacted her approximately two weeks after the shooting, inquiring whether Mr. Mozee would be paroled or released from jail. From August 1 until August 12, 2003, Ms. Martinez spoke with Ms. Ferguson several times. Their conversations focused on domestic violence issues and the possibility of Ms. Ferguson attending domestic violence counseling. Based on her 17 years of experience and training in the area of domestic violence, Ms. Martinez opined that Ms. Ferguson was afraid of Mr. Mozee and the possibility that he might be released from jail.

The officer who prepared Mr. Mozee's presentence report (PSR) evaluated the facts and circumstances of Ms. Ferguson's shooting and proposed a four-level enhancement to Mr. Mozee's base offense level, pursuant to § 2K2.1(b)(5), because his felony possession of the firearm was "in connection with" the felony

offense of aggravated assault. Mr. Mozee objected to the enhancement, contending the discharge of the weapon was accidental and therefore did not support a finding that he committed an aggravated assault. The district court was unpersuaded by Mr. Mozee and found that the shooting of Ms. Ferguson was intentional and volitional, rather than simply the product of an accidental discharge of the weapon. As a consequence, the court applied the four-level enhancement for Mr. Mozee's possession of a firearm in connection with an aggravated assault. Mr. Mozee appeals.

## II

The relevant sentencing provision provides a four-level enhancement if the court finds, by a preponderance of the evidence, that the defendant "used or possessed any firearm or ammunition in connection with another felony offense; or possessed . . . any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." U.S.S.G. § 2K2.1(b)(5); *see Norris*, 319 F.3d at 1284; *United States v. Hurlich*, 293 F.3d 1223, 1227 (10th Cir. 2002). A "felony offense" "means any offense (federal, state, or local) punishable by imprisonment for a term exceeding one year, whether or not a criminal charge was brought, or conviction obtained." U.S.S.G. § 2K2.1(b)(5), cmt. n.7.

The district court determined that Mr. Mozee possessed the firearm in connection with the Wyoming felony of aggravated assault. Mr. Mozee contends the district court failed to apply the correct legal definition of "aggravated assault" as defined by Wyoming law. Specifically, he claims the court misunderstood the "intent" or *mens rea* element of aggravated assault. We review a district court's legal determinations *de novo*. *United States v. Norris*, 319 F.3d 1278, 1283-84 (10th Cir. 2003).

Under Wyoming law, a person is guilty of aggravated assault and battery if he or she:

> (i) Causes serious bodily injury to another intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;
> (ii) Attempts to cause, or intentionally or knowingly causes bodily injury to another with a deadly weapon;
> (iii) Threatens to use a drawn deadly weapon on another unless reasonably necessary in defense of his [or her] person, property or abode or to prevent serious bodily injury to another; or
> (iv) Intentionally, knowingly or recklessly causes bodily injury to a woman whom he [or she] knows is pregnant.

WYO. STAT. ANN. § 6-2-502(a). To be convicted under this statute, Mr. Mozee must have volitionally pulled the trigger that led to Ms. Ferguson's injury. *See, e.g.*, *Cox v. State*, 829 P.2d 1183, 1185-86 (Wyo. 1992) (holding that WYO. STAT. ANN. § 6-2-502(a)(iii) defines a general intent crime, which simply describes a particular act and requires only that intent that may be inferred from doing the act constituting the offense charged). The defense concedes this point. Aplt. Rep.

-8-

Br. at 6 ("at a minimum, any version of aggravated assault at least requires general intent").

The district court, referring to the *mens rea* element of aggravated assault in Wyoming, stated during the sentencing hearing:

> There is no intent beyond the intent to do the act for an aggravated assault or assault with a deadly or dangerous weapon, for that matter. The circumstance is an unlawful touching or threat to perform an unlawful touching by someone who is acting knowingly, knowing what they're doing. Here it is contended in the report that the contact – the conduct of the defendant is comparable to an aggravated assault.

Rec., vol. IV at 37. The court determined Mr. Mozee shot Ms. Ferguson intentionally, not accidentally, and unambiguously concluded: "the circumstances here do reflect an aggravated assault." *Id.* at 41. An "intentional" shooting is without doubt volitional and knowing.[1]

In response to the holding in *Cox*, Mr. Mozee argues that WYO. STAT. ANN.

---

[1]Mr. Mozee cites *O'Brien v. State*, 45 P.3d 225 (Wyo. 2002) and *Garcia v. State*, 777 P.2d 1091 (Wyo. 1989), to support his position that WYO. STAT. ANN. §§ 6-2-502(a)(i) and (ii) apply to the facts of his case and require specific proof of *mens rea*. Even if this were true, while "the bare fact of assaultive behavior will not give rise to a *presumption* that an assailant had the specific intent to cause any particular harm," "the specifics of a defendant's conduct and other circumstantial evidence may permit the jury to infer that he acted with the specific intent to cause bodily injury." *Garcia*, 777 P.2d at 1095. As stated above, the district court explicitly found that Mr. Mozee intentionally fired the weapon which resulted in Ms. Ferguson's wounds. That finding is sufficient to satisfy the Wyoming statute. The intentional shooting of a loaded .380 handgun into a victim's back during a heated argument clearly could give rise to a reasonable inference that the shooter acted with the specific intent to cause his victim bodily injury.

§ 6-2-502(a)(iii) does not apply to him because there was no suggestion he had threatened to use a drawn weapon against Ms. Ferguson.  We are not persuaded. The language, "[t]hreatens to use," merely describes what a defendant must do with a weapon to be guilty of aggravated assault.  *See Johnston v. State*, 747 P.2d 1132, 1134 (Wyo. 1987) ("threatens to use" requires an actual threat of physical injury during the act of employing a deadly weapon).  As a general intent crime, aggravated assault allows the element of intent to be inferred from doing the act constituting the offense charged, such as pointing a loaded gun at a victim.  *See Streitmatter v. State*, 981 P.2d 921, 924 (Wyo. 1999) (slashing back and forth with a hunting knife constitutes an actual threat of physical injury).  Accordingly, we find no fault in the district court's determination that Mr. Mozee's actions, if not accidental, satisfied Wyoming's definition of aggravated assault.

**III**

Mr. Mozee next contends the district court erred in determining there was sufficient evidence to support a finding he intentionally shot Ms. Ferguson. When evaluating sentence enhancements under the Sentencing Guidelines, we review the district court's factual findings for clear error and questions of law *de novo*.  *Norris*, 319 F.3d at 1283-84.  We will not disturb a factual finding unless it has no basis in the record.  *United States v. Martin*, 163 F.3d 1212, 1217 (10th

-10-

Cir. 1998). Moreover, in reviewing the court's decision to apply an enhancement, we view the evidence and inferences therefrom in the light most favorable to the district court's determination. *United States v. Brown*, 314 F.3d 1216, 1222 (10th Cir. 2003).

The district court's finding that Mr. Mozee intentionally shot Ms. Ferguson, which qualified him for the § 2K2.1(b)(5) enhancement, is supported by the following evidence. First, it was uncontested at the sentencing hearing that Ms. Ferguson received serious bodily injury as the result of the discharge of a deadly firearm wielded by Mr. Mozee. It was also uncontroverted that, subsequent to the shooting, Mr. Mozee called a friend who lived 70 miles away to assist in the situation rather than calling an ambulance or taking Ms. Ferguson to the hospital where she could receive treatment for her wounds. Mr. Mozee himself admitted that he simply left Ms. Ferguson bleeding on the couch from her untreated wounds while Ms. Hoffman made the trek from Loveland, Colorado to Cheyenne, Wyoming. The district court emphasized this fact in its sentencing colloquy and noted this was "bizarre conduct" in such a situation. Rec., vol. IV at 39.

The court also specifically referred to the various versions of the incident provided by Ms. Ferguson and Mr. Mozee to the CPD investigating officers. According to Detective Weese's testimony, Ms. Ferguson first reported that she was wounded by a rock thrown from a passing car. She later recanted this version of events and explained that she was the victim of a drive-by shooting. Mr.

Mozee also provided a drive-by shooting story to explain Ms. Ferguson's wounds. Detective Weese subsequently discovered that both Mr. Mozee and Ms. Ferguson had completely fabricated this version of events. As implied by the district court, the fact that both Mr. Mozee and Ms. Ferguson told the same lie strongly suggests they had something to hide and that the shooting was something other than an accident; otherwise, they both would have simply conveyed the accidental nature of the incident to the investigating officers. Mr. Mozee's constantly shifting story, in particular, made his credibility questionable.

Detective Weese admitted on cross-examination that through a series of contortions, dance steps, twirling, and hammerlock moves choreographed and suggested by defense counsel, it was possible that when the gun was discharged, it could have accidentally caused a wound similar to that sustained by Ms. Ferguson. But neither Detective Weese nor the district court was convinced this scenario was likely. First, neither Mr. Mozee nor Ms. Ferguson provided a description of events that even remotely mirrored the series of moves suggested by defense counsel. According to Mr. Mozee, during a heated argument, as he was in the process of placing the gun in the waistband of his pants, Ms. Ferguson grabbed his arm and pulled it, causing the muzzle of the weapon to sweep across her body and at some point pass over her back side. Thus, as Mr. Mozee detailed the altercation, Ms. Ferguson would likely have been standing upright and on her feet at the time the gun discharged, a fact which would make the downward

trajectory of the bullet difficult to explain.  The district court also noted that "Ms. Ferguson said nothing in her reports to the police officer about grabbing the firearm or about this dance.  There was no reason for her not to have done so except she didn't know the story that was told."  *Id*. at 41.  In sum, there was no evidence whatsoever that the hypothetical version offered by defense counsel took place; in fact, the actual evidence before the court conflicted with the defense's account of the shooting as accidental.

Ultimately, the court agreed with Detective Weese: it was "likely, more likely" "the weapon was discharged and [Ms. Ferguson] was in a crouching position perhaps moving to the door or starting to move towards the door."  *Id*. at 40.  The court noted the absence of "stippling" or "tattooing" around Ms. Ferguson's wounds, the presence of which would have corroborated Mr. Mozee's story.  The court also determined Mr. Mozee's statement that Ms. Ferguson had been shot because "she was fucking with [him]," *id.* at 27, "certainly illustrates a frame of mind and an acceptance, almost a recognition of fault or responsibility on the part of the defendant that [Ms. Ferguson] deserved what she got."  *Id*. at 40.

The district court made credibility determinations, parsed the detailed evidence, and rejected Mr. Mozee's accidental discharge theory as unsupported by the record and "inexplicable."  *Id*. at 41.  The court decided a preponderance of the evidence supported the conclusion that Mr. Mozee's shooting of Ms. Ferguson

was intentional and the product of domestic violence. *Id.* Based on this finding, the court ruled Mr. Mozee possessed the firearm in connection with the commission of an aggravated assault, thus justifying a four-level enhancement pursuant to § 2K2.1(b)(5). Given the record here, we simply cannot hold the district court's finding that Mr. Mozee intentionally shot Ms. Ferguson was based on insufficient evidence.

## IV

Mr. Mozee contends the district court violated his Sixth Amendment right to a jury trial by imposing a sentence exceeding the maximum authorized solely by his plea and prior convictions. *See United States v. Booker*, 125 S. Ct. 738, 756 (2005); *Blakely*, 124 S. Ct. at 2536 (2004). Citing *Blakely* and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), he specifically maintains his sentence could only be enhanced pursuant to § 2K2.1(b)(5) if either a jury had found or he had admitted that he used the firearm in connection with another felony offense.

In *Blakely*, 124 S. Ct. at 2536, the Supreme Court applied the rule it expressed in *Apprendi* to Washington state's determinate sentencing regime. Recently, the Court extended *Apprendi* and *Blakely* to the Federal Sentencing Guidelines, holding that the Sixth Amendment requires that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict

-14-

must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 125 S. Ct. at 756. To remedy the guidelines' Sixth Amendment problem, the Court severed and excised 18 U.S.C. § 3553(b)(1), which required sentencing courts to impose a sentence within the applicable guidelines range, subject to departures in limited cases. *Id*. at 764. As a result, the guidelines are now advisory in all cases. *Id*. at 757. In addition, the Court expressly stated that its "interpretation of the Sentencing Act" should be applied "to all cases on direct review." *Id*. at 769. We must therefore evaluate Mr. Mozee's sentence in light of the Court's holding in *Booker*.

Mr. Mozee pled guilty to a charge of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Based on an undisputed criminal history category of V and total offense level of 21,[2] a guidelines range of 70 to 87 months was the maximum penalty Mr. Mozee could have been given based solely on the facts he admitted plus his prior convictions. *See* U.S.S.G. ch. 5 pt. A (Sentencing Table). At sentencing, however, and as discussed above, the district court enhanced Mr. Mozee's guidelines range by four offense levels pursuant to a finding that he possessed the firearm in connection

---

[2]Mr. Mozee received an initial base offense level of 24 for unlawful possession of firearm after at least two felony convictions for crime of violence or controlled substance offense. *See* U.S.S.G. § 2K2.1(a)(2). The total offense level of 21 incorporates a three-level downward adjustment Mr. Mozee received for acceptance of responsibility.

with the commission of another felony offense. As a result, Mr. Mozee's total offense level was calculated at 25, mandating a guidelines range of 100 to 120 months incarceration. *Id.*[3] Mr. Mozee argues that because the maximum penalty he could receive solely on the basis of his admissions was 87 months, the 120 month sentence imposed by the district court violates the Sixth Amendment.

Because Mr. Mozee did not raise his Sixth Amendment argument in the district court, we review his claim for plain error. FED. R. CRIM. P. 52(b); *see also United States v. Dazey*, No. 03-6187, 2005 WL 846227, at *19 (10th Cir. Apr. 13, 2005). To establish plain error, Mr. Mozee must demonstrate there was (1) error (2) that is plain and (3) affected his substantial rights. *United States v. Cotton*, 535 U.S. 625, 631 (2002); *United States v. Gonzalez-Huerta*, No. 04-2045, 2005 WL 807008, at *3 (10th Cir. Apr. 8, 2005) (*en banc*). If Mr. Mozee satisfies his burden of establishing the first three prongs of the plain error test, we may exercise our discretion to correct the error if it "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 469-70 (1997) (quoting *United States v. Olano*, 507

---

[3]Based on a total offense level of 25 and a criminal history category of V, Mr. Mozee's guidelines imprisonment range was actually 100 to 125 months. U.S.S.G. Ch. 5 Pt. A. Because the statutory maximum sentence was 10 years (120 months), *see* 18 U.S.C. § 924(a)(2), however, the statutory maximum of 120 months became the guidelines range maximum pursuant to U.S.S.G. § 5G1.1(c)(1). As a result, Mr. Mozee's guidelines sentencing range was 100 to 120 months.

U.S. 725, 736 (1993)); *Gonzalez-Huerta*, 2005 WL 807008, at *3.

There is little doubt Mr. Mozee has satisfied the first three prongs of the plain error analysis. The district court committed constitutional error when it found that Mr. Mozee had used a firearm in connection with another felony offense and applied a mandatory four-level enhancement to his sentence. *Booker*, 125 S. Ct. at 749 ("Since this fact was found by a judge using a preponderance of the evidence standard, the sentence violated [the defendant's] Sixth Amendment rights."); *Blakely*, 124 S. Ct. at 2537. Moreover, the error is now "plain" or "obvious." *Johnson*, 520 U.S. at 468 ("where the law at the time of trial [or sentencing] was settled and clearly contrary to the law at the time of appeal – it is enough that an error be 'plain' at the time of appellate consideration").

In order to demonstrate that an error affected his substantial rights, "a defendant must show a 'reasonable probability' that the defects in his sentencing altered the result of the proceedings." *Dazey*, 2005 WL 846227, at *20 (citing *United States v. Dominguez Benitez*, 124 S. Ct. 2333, 2339 (2004)). We have held in the context of reviewing a constitutional *Booker* error that a defendant may meet this burden in at least two ways:

> First, if the defendant shows a reasonable probability that a jury
> applying a reasonable doubt standard would not have found the same
> material facts that a judge found by a preponderance of the evidence,
> then the defendant successfully demonstrates that the error below
> affected his substantial rights . . . . Second, a defendant may show
> that the district court's error affected his substantial rights by

-17-

demonstrating a reasonable probability that . . . the district court judge would reasonably impose a sentence outside the Guidelines range.

*Id.*, slip op. at 49-50. Mr. Mozee contends there was insufficient evidence for a jury to find beyond a reasonable doubt the sentencing-enhancing fact that the district court found by a preponderance of the evidence.

As detailed in part III of our analysis, the inculpatory evidence presented by the government at Mr. Mozee's sentencing was sufficient under a preponderance of the evidence standard to establish that he possessed a firearm in connection with the commission of an aggravated assault. But the government concedes the evidence in support of that finding "was in no sense either overwhelming or uncontradicted." Aple. Supp. Br. at 4. In fact, Mr. Mozee vigorously contested the government's assertion that he intentionally shot Ms. Ferguson. On this record, we conclude there is a reasonable probability a jury evaluating the evidence presented at Mr. Mozee's sentencing would not have found beyond a reasonable doubt that he possessed the firearm in connection with the commission of an aggravated assault. Mr. Mozee has thus satisfied his burden to show that the four-level enhancement imposed by the district court affected his substantial rights.

The closer question is whether we should exercise our discretion to correct the error. Mr. Mozee has the burden of persuading us that the error seriously

-18-

affected the fairness, integrity, or public reputation of judicial proceedings. *United States v. Vonn*, 535 U.S. 55, 63 (2002). When the district court commits a constitutional error and the defendant has proven that the error affected his or her substantial rights, we would normally exercise our discretion to correct the error. *See Gonzalez-Huerta*, 2005 WL 807008, at *14 (Hartz, J., concurring). This is so because a reversal usually directly cures the constitutional infirmity and, as a result, the failure to notice and correct the constitutional error would impugn the fairness, integrity, or public reputation of judicial proceedings. *Id.* Constitutional *Booker* error, however, is unique because the remedy for such an error is not a direct cure. That is, the remedy is not to set aside the unconstitutional judicial finding and remand for a retrial at which the jury would have to find all facts needed to determine the offense level. Rather, the remedy – a remand for resentencing under a discretionary guidelines regime – only cures the error indirectly. *Id.* Thus, in the instant case, the question before us is whether a reversal and remand for resentencing by the district court under a discretionary guidelines regime would advance the fairness, integrity, or public reputation of the courts. We conclude it would not.

After the district court determined Mr. Mozee's applicable guidelines range was 100 to 120 months imprisonment, it opted to sentence Mr. Mozee to a 120-month term. In other words, the court exercised its discretion and in doing so

sentenced Mr. Mozee to serve the maximum term of imprisonment it could lawfully impose. As a result, any argument that the court might have sentenced Mr. Mozee to 87 months or less had it understood it had discretion to do so is simply unpersuasive. Because the court decided to maximize punishment rather than exercise leniency where it had discretion, there is no basis for us to assume Mr. Mozee would receive a lesser sentence if he were resentenced under a discretionary sentencing regime in which the district court is required to "consider" the guidelines when it exercises its discretion. *See Booker*, 125 S. Ct. at 764. Under these circumstances, Mr. Mozee has failed to persuade us that the Sixth Amendment error here seriously affects the fairness, integrity, or public reputation of judicial proceedings. We therefore decline to exercise our discretion to correct the forfeited error.

For the foregoing reasons, we **AFFIRM**.

No. 04-8015, *United States v. Mozee*

**MURPHY**, Circuit Judge, concurring.

I join sections I, II, and III of the majority opinion. I also join in the result and in section IV except to the extent that it holds Mozee has satisfied the third prong of the plain-error test. I would not reach that relatively difficult question because, for the reasons given in the majority opinion, Mozee cannot in any event meet his burden of demonstrating that the district court's error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *See United States v. Cotton*, 535 U.S. 625, 632-33 (2002) ("[W]e need not resolve . . . [the third prong of plain-error review], because even assuming respondents' substantial rights were affected, the error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings."); *Johnson v. United States*, 520 U.S. 461, 469-70 (1997); *United States v. Gonzalez-Huerta*, No. 04-2045, --- F.3d ----, 2005 WL 807008, at *6 (10th Cir. Apr. 8, 2005) (en banc).