**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 2, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ROBERT VASQUEZ,

Defendant - Appellant.

No. 14-3079
(D.C. No. 2:12-CR-20066-KHV-JPO-20)
(D. Kansas)

**ORDER AND JUDGMENT**[*]

Before **PORFILIO**, **ANDERSON**, and **MURPHY**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Following a jury trial, Defendant and Appellant, Robert Vasquez, was found guilty of two counts of money laundering, and sentenced to 70 months'

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

imprisonment. As part of that sentencing determination, the district court imposed a six-level enhancement under the United States Sentencing Commission, Guidelines Manual ("U.S.S.G.") § 2S1.1(b)(1), because it determined that Mr. Vasquez "knew or believed that any of the laundered funds were the proceeds of, or were intended to promote . . . an offense involving the manufacture, importation, or distribution of a controlled substance." Id. Arguing that the evidence at sentencing failed to support that enhancement, and that the district court erred in imposing it, Mr. Vasquez appeals his sentence. We affirm.

**BACKGROUND**

The trial revealed the following facts, which neither party disputes: In October of 2010, the Drug Enforcement Administration ("DEA") initiated an investigation into the illegal distribution of cocaine by an individual named Djuane Sykes and his criminal associates, a Kansas City, Kansas, street gang known as "Deuce Deuce." Special Agent Nicholas Wills and Task Force Officer Eric Jones headed the investigation. The investigation involved the interception of calls from forty-three cellular telephones, including multiple roving interceptions of calls involving Hector Aguilera, who was identified as a significant distributor of cocaine in the Kansas City metropolitan area. The interceptions of Mr. Sykes' telephone calls quickly led to the identification of multiple sources of cocaine, which was being transported from Mexico by various

means to the Kansas City area. DEA investigators intercepted hundreds of calls between June 2011 and April 2012.

On January 10, 2012, DEA investigators began intercepting a series of telephone calls between Mr. Aguilera and Humberto Ramirez-Lerma, a/k/a "El Arabe," who was a drug trafficker living in California. The calls indicated that, as payment for a large prior shipment of cocaine, Mr. Aguilera would be sending a significant quantity of United States currency to the Mexican sources of that cocaine. The currency would be delivered via a tractor trailer courier facilitated by "El Arabe." DEA agents intercepted additional calls on January 12, which indicated that the courier had arrived in the Kansas City area. Mr. Aguilera advised "El Arabe" that the exchange would take place the following morning (on January 13). Mr. Aguilera confirmed in these calls that he had collected in excess of $500,000.

On January 13, 2012, Mr. Aguilera spoke to "El Arabe" about meeting the courier at a Shell gas station near Exit 8B off of I-435. Agents conducting surveillance observed Mr. Aguilera and a co-defendant, Gerardo Flores-Avila, arrive at the location. Agents followed these two individuals to Swift Trucking in Edwardsville, Kansas, while intercepting calls between Mr. Aguilera and "El Arabe." "El Arabe" told Mr. Aguilera that the courier would be wearing black pants and a brown jacket. Agents then saw defendant Mr. Vasquez, wearing black pants and a brown jacket, enter Mr. Aguilera's Dodge pickup truck. Mr. Aguilera

drove a short distance, at which time Mr. Vasquez exited the pickup truck, carrying a black duffle bag. Mr. Vasquez entered a Swift semi-truck with a trailer and drove away from the lot. At that time, Mr. Aguilera called "El Arabe" and advised him that the transaction had been done. During a subsequent call, Mr. Aguilera told "El Arabe" to alert Mr. Vasquez about a suspicious looking vehicle that had been in the parking lot and to warn Mr. Vasquez to be careful and pay attention.

Mr. Vasquez drove southbound on I-435, then southbound on I-35, heading towards Wichita, Kansas. A caravan of DEA investigators provided constant surveillance of Mr. Vasquez from the time he left Kansas City. Mr. Vasquez then traveled west out of Wichita on Highway 54, and the DEA agents decided to contact Kansas Highway Patrol ("KHP") troopers for assistance in conducting a stop of Mr. Vasquez's truck.

At approximately 3:59 p.m., KHP trooper Lee Rose observed Mr. Vasquez's truck in Pratt County, Kansas, and initiated a commercial vehicle safety inspection stop. At Trooper Rose's request, Mr. Vasquez produced a Texas driver's license, his permit book, log book, and medical card. Mr. Vasquez informed Trooper Rose that he was coming from the Edwardsville, Kansas, terminal and did not have any shipping papers because his truck was empty. He indicated he was driving to El Paso, Texas, with an empty truck, which Trooper Rose found to be unusual given the cost associated with traveling that distance

with an empty truck. Because of safety concerns at the particular location of the initial stop, the trooper asked Mr. Vasquez to move his truck to a nearby truck stop to complete the safety inspection, and Mr. Vasquez complied.

At the truck stop, Mr. Vasquez exited his truck and apparently assisted in various aspects of the inspection. Trooper Rose completed a Level II inspection and discovered no violations. He also completed a KHP Driver/Vehicle Examination Report and ran routine checks of Mr. Vasquez's driver's license, registration and the United States Department of Transportation number associated with the truck. Trooper Rose testified that Mr. Vasquez appeared "very nervous" during the truck inspection, and chewed gum "vigorously." Supp. Vol. 1 at 639. He further stated that "[m]ost commercial motor vehicle drivers are not that nervous when they deal with law enforcement" because "[t]hey get stopped on a regular basis for commercial motor vehicle inspections." Id. The trooper also stated that he noticed a "strong odor" of air freshener. Id. at 640.

At the completion of the inspection, Trooper Rose returned all of Mr. Vasquez's documents to him, confirming that Mr. Vasquez had them all. As Trooper Rose was walking back to his vehicle, and Mr. Vasquez was climbing back in his truck cab, the trooper returned to the truck and asked Mr. Vasquez if he could answer some more questions. Mr. Vasquez replied "yeah." Id. at 651. The trooper asked if there was "anything illegal" in the truck, such as "guns, weapons, drugs or large amounts of money." Id. at 652. Mr. Vasquez "replied in

-5-

a repetitive no, no, sir, to each . . . question." Id. When Trooper Rose asked Mr. Vasquez if he could search the truck, Mr. Vasquez responded, "no, . . . he didn't mind." Id. Trooper Rose then patted Mr. Vasquez down, and "confirmed with him again . . . [that he] could search the truck and trailer and he said go ahead." Id. at 654.

Trooper Rose then searched the cab of the truck. In the sleeper berth, under the bed, he discovered a black duffle bag that contained bundles of what appeared to be U.S. currency wrapped in black tape. DEA investigators subsequently determined that the duffle bag contained fifty-five bundles, totaling $549,749.00.

Mr. Vasquez was thereupon arrested and transported to the Pratt County Law Enforcement Center, where he was interviewed by agents Jones and Wills. Mr. Vasquez was advised of his Miranda rights, waived those rights, and agreed to speak to the agents. Mr. Vasquez initially told the agents that he thought the black bag contained marijuana or cocaine. Mr. Vasquez eventually admitted that he was transporting U.S. currency for an individual named "Arabe" and he expressed a great deal of fear. Mr. Vasquez further explained that he met "Arabe" at an airport terminal in Fontana, California, and that he had communicated with "Arabe" several times about picking up money in Kansas City and transporting it to El Paso. Mr. Vasquez told agents Jones and Wills that he was paid $1000 for the job.

-6-

Mr. Vasquez then agreed to cooperate with law enforcement and contacted DEA Agent Yvette Lomeli once he returned to El Paso. Agent Lomeli met with Mr. Vasquez on several occasions and he told her that he had met "Arabe" through an individual he identified as Gloria Saldana, who also worked as a truck driver. Mr. Vasquez told Agent Lomeli that Ms. Saldana and "Arabe" had asked him to pick up some money in Kansas City and deliver it to El Paso. Mr. Vasquez indicated that he was aware there was money in the bag that he was transporting to El Paso. Ultimately, Mr. Vasquez failed to follow through in his efforts to cooperate with law enforcement, and he stopped communicating with Agent Lomeli.

Subsequently, in October 2012, a grand jury indicted Mr. Vasquez and fifty-two other individuals in a Second Superseding Indictment. The Indictment charged numerous narcotic, money laundering, and firearms offenses. Mr. Vasquez was charged in three counts: Count 1 charged him with conspiracy to manufacture, to possess with intent to distribute and to distribute five kilograms or more of cocaine; Count 2 charged him with conspiracy to engage in money laundering; and Count 75 charged him with laundering $549,749 in U.S currency on January 13, 2012.

The trial commenced on August 5, 2013, and lasted five months. On January 2, 2014, the jury convicted Mr. Vasquez on the two money laundering offenses (Counts 2 and 75) and acquitted him of the drug conspiracy in Count 1.

Count 2 required the jury to find the following elements established beyond a

reasonable doubt in regards to Mr. Vasquez:

> FIRST: From in or about January of 2009 and continuing to on or about April 27, 2012, . . . two or more persons agreed to transport or attempt to transport funds from a place in the United States to and through a place outside the United States, either (a) with the intent to promote the carrying on of a conspiracy to possess with intent to distribute and to distribute five kilograms or more of a mixture and substance containing cocaine; or (b) <u>knowing that the funds represented the proceeds of some form of unlawful activity and knowing that such transportation was designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of a conspiracy to possess with intent to distribute and to distribute five kilograms or more of a mixture and substance containing cocaine</u>;

> SECOND: Robert Vasquez voluntarily and intentionally joined the agreement;

> THIRD: When Robert Vasquez joined, he knew the essential objective of the agreement; and

> FOURTH: The parties to the agreement intended to act together within the scope of the agreement for their shared mutual benefit.

Doc. 1213, Instr. No. 23 at 30 (emphasis added).[1]

Count 75 required the jury to find the following elements had been proven

beyond a reasonable doubt:

> FIRST: Defendant knowingly transported or attempted to transport funds from a place in the United States to or through a place outside the United States; and

---

[1]The jury instructions do not appear to be in the record in this case. The government's brief contains the jury instruction quoted above, and Mr. Vasquez does not dispute the accuracy of that representation. Brief of Appellee at 13-14.

SECOND: Defendant did so <u>with the intent to promote the carrying</u> <u>on of a conspiracy to possess with intent to distribute five kilograms</u> <u>or more of a mixture or substance containing cocaine</u>.

Doc. 1213, Instr. 24 at 32 (emphasis added).

As indicated, the jury found Mr. Vasquez guilty of both money laundering counts (Counts 2 and 75) and acquitted him of the drug conspiracy in Count 1.

Following the jury verdict, in preparation for sentencing under the advisory Guidelines, the United States Probation Office prepared a presentence report ("PSR"). The PSR assessed a six-level enhancement to Mr. Vasquez's offense level under U.S.S.G. §2S1.1(b)(1). Mr. Vasquez objected to this enhancement, arguing there was "no evidence whatsoever that Vasquez *knew or believed* that these monies were the proceeds of, or were intended to promote, an offense involving the manufacture, importation, or distribution of a controlled substance." PSR ¶ 163; R. Vol. 3 at 49. The government disagreed with Mr. Vasquez's objection, stating:

> This is an incorrect assertion. In fact the defendant first told investigators post-Miranda that he thought the bundles he was transporting were either packages of cocaine or marijuana. When agents told him they didn't think he was being truthful about his story, he then admitted that he had been contacted by "Arabe" and was asked to pick up some money in Kansas City. He further admitted that the money did not belong to him, but that he was only delivering it to El Paso. He indicated he was going to get paid $1,000 for doing the job. Vasquez was tearful and fearful throughout his contact with the law enforcement officers. In addition, there was testimony during trial from Yvette Lomeli, a DEA agent from El Paso, Texas, who had subsequent contact with Vasquez. He likewise

> admitted to her that he had been hired to transport money for El Arabe.
>
> The defendant attempts to bolster his position by the jury's verdict as to Count 1. In order to convict the defendant of this count, the jury had to find the requisite elements beyond a reasonable doubt. This acquittal does not support his contention; however, because the acquittal only tends to support that the jury didn't think that the defendant was personally involved in the transporting of the narcotics–which in fact, there was no evidence of. In order to establish the 6-level enhancement, the burden of proof is by only a preponderance of the evidence; the defendant seems to suggest that the burden should be higher.

PSR ¶¶ 164-65; R. Vol. 3 at 50. The government went on to point out that the evidence showed that Mr. Vasquez's co-conspirators may have wanted to keep him "in the dark" about various aspects of the overall conspiracy. However, the fact that "he immediately referenced that he was transporting drugs before admitting that it was money," leads to the "reasonable . . . conclu[sion] that the defendant knew or believed the money was proceeds from the specified unlawful activity (drug trafficking)." Id. ¶ 166; R. Vol. 3 at 50. The government then refuted Mr. Vasquez's suggestion that his minimal participation reduction under U.S.S.G. § 3B1.2 supports his argument, stating that the reduction was given because "this incident is the only evidence the Government has in which the defendant assisted the organization," id., contrasted with "many of the other couriers" who "were involved on multiple occasions and those that were not received this adjustment." Id.

At Mr. Vasquez's sentencing, Mr. Vasquez again argued that there was no evidence he knew the origination of the money and he asserted that the coconspirators were trying to keep him in the dark about the money. The government responded that his coconspirators were only trying to keep him in the dark about the *amount* of the money he was transporting.

The district court overruled Mr. Vasquez's objection to the sentencing enhancement and found that the only reasonable inference a person could draw from his conduct, along with the statements that he made, was that he knew he was transporting the proceeds of drug transactions. The court accordingly sentenced him to 70 months' imprisonment. This appeal followed.

**DISCUSSION**

**I. Sufficiency of Evidence:**

Mr. Vasquez first argues there was insufficient evidence to support the sentencing enhancement under U.S.S.G. §2S1.1(b)(1). In particular, he argues that, because he was acquitted of the drug trafficking conspiracy, the evidence was insufficient to establish that he knew or believed the money he was transporting constituted proceeds from drug trafficking.

> When evaluating sentence enhancements under the Sentencing Guidelines, we review the district court's factual findings for clear error and questions of law *de novo*. We will not disturb a factual finding unless it has no basis in the record. Moreover, in reviewing the court's decision to apply an enhancement, we view the

> evidence and inferences therefrom in the light most favorable to the district court's determination.

United States v. Mozee, 405 F.3d 1082, 1088 (10th Cir. 2005) (internal citations omitted); see also United States v. Beltran, 571 F.3d 1013, 1020 (10th Cir. 2009). Under the clear error standard, "we will not reverse the district court's finding unless, 'on the entire evidence, we are left with the definite and firm conviction that a mistake has been committed.'" United States v. Shengyang Zhou, 717 F.3d 1139, 1149 (10th Cir. 2013) (quoting United States v. James, 592 F.3d 1109, 1113 (10th Cir. 2010)).

"The government bears the initial burden of proving the enhancement appropriate by a preponderance of the evidence." United States v. Castro-Perez, 749 F.3d 1209, 1211 (10th Cir. 2014). The government clearly met that burden. As the government points out, Mr. Vasquez's conviction on Count 2 required the jury to find, beyond a reasonable doubt, that Mr. Vasquez knew the money involved was derived from unlawful activity (the conspiracy to manufacture, possess with intent to distribute and to distribute cocaine). Similarly, a conviction on Count 75 required proof beyond a reasonable doubt that Mr. Vasquez knowingly transported the money with the intent to promote the carrying out of the drug conspiracy.

Furthermore, Mr. Vasquez initially admitted to transporting drugs, not money. There was also evidence that he was afraid of "El Arabe;" the district

-12-

court could reasonably infer from that fearfulness, along with the other evidence, that Mr. Vasquez knew his transporting of the money was connected to illegal drug activity.

Mr. Vasquez suggests that his acquittal on the drug conspiracy charge of Count 1 means that the enhancement was improper. As with the prior argument, this claim confuses the burden of proof for a sentencing enhancement, as opposed to a jury conviction. To find Mr. Vasquez guilty of Count 1, the jury would have had to convict him beyond a reasonable doubt as to each element. By contrast, the standard for application of the sentencing enhancement under U.S.S.G. § 2S1.1(b)(1) is only a preponderance of the evidence. "[W]hen a district court makes a determination of sentencing facts by a preponderance test under the now-advisory Guidelines, it is not bound by jury determinations reached through application of the more onerous reasonable doubt standard." United States v. Bass, 661 F.3d 1299, 1307 (10th Cir. 2011) (quoting United States v. Magallenez, 408 F.3d 672, 685 (10th Cir. 2005)).[2]

---

[2]Similarly, we reject Mr. Vasquez's reliance on United States v. Jones, 44 F.3d 860, 865 (10th Cir. 1995), to challenge the validity of any reliance upon inferences. While we noted in Jones that "an inference must be more than speculation and conjecture to be reasonable," that case involved the sufficiency of the evidence to support a conviction under the reasonable doubt standard. It did not involve a sentencing enhancement under the preponderance of the evidence standard. Other cases cited by Mr. Vasquez are also inapposite.

-13-

In sum, viewing the evidence and inferences in the light most favorable to the district court's determination, we find there was sufficient evidence to support the application of the enhancement.

## II. Did the District Court Err in Applying Enhancement:

Mr. Vasquez also argues the district court erred in denying his objection to the U.S.S.G. § 2S1.1(b)(1) sentencing enhancement. U.S.S.G. § 2S1.1 distinguishes between primary and secondary money launderers. Because Mr. Vasquez did not commit the underlying offense (drug trafficking) for which the moneys were laundered, he was assigned a base offense level of 8 plus a number from the table in § 2B1.1 corresponding to the value of the laundered funds. See § 2S1.1(a)(2). The Guidelines then provide for an enhancement in certain situations, where the defendant was not necessarily directly involved in the underlying offense, but still has some knowledge of the unlawful activity:

> (b) Specific Offense Characteristics:
>
>> (1) If (A) [U.S.S.G. § 2S1.1](a)(2) applies; and (B) the defendant knew or believed that any of the laundered funds were proceeds of, or were intended to promote . . . an offense involving the manufacture, importation, or distribution of a controlled substance or a listed chemical . . . increase by **6** levels.

U.S.S.G. § 2S1.1(b)(1). The PSR recommended that this 6-level enhancement apply. As indicated, Mr. Vasquez objected to that enhancement in the PSR, and he maintained his objection at sentencing. He continues to argue on appeal that

the district court erred in imposing that enhancement because it "was without factual support and was erroneously applied." Appellant's Br. at 16.

We review sentences for procedural and substantive reasonableness under a deferential abuse-of-discretion standard. United States v. Huckins, 529 F.3d 1312, 1317 (10th Cir. 2008). Procedural reasonableness "relates to the manner in which the district court calculated and explained the sentence." United States v. A.B., 529 F.3d 1275, 1278 (10th Cir. 2008). In determining whether the district court correctly calculated the recommended Guidelines range through application of the Guidelines, we review de novo the district court's legal conclusions and we review any factual findings for clear error, giving due deference to the district court's application of the Guidelines to the facts. See United States v. Kristl, 437 F.3d 1050, 1054 (10th Cir. 2006 ) (per curiam). Mr. Vasquez challenges the procedural reasonableness of his sentence by arguing that the court erred in applying the § 2S1.1 enhancement.

As both parties agree, the sentencing enhancement does not turn on the objective characteristic of the funds, but rather upon the subjective knowledge or belief of the defendant, Mr. Vasquez. See United States v. Payne, 962 F.2d 1228, 1235 (6th Cir. 1992); see also United States v. Mitchell, 613 F.3d 862 (8th Cir. 2010).

There is sufficient evidence to support the district court's application of the enhancement, and the court accordingly did not err in imposing it. Much of our

-15-

discussion above supports this conclusion. In addition, at sentencing the following exchange took place between the court and defense counsel:

THE COURT: Isn't it a completely reasonable inference to assume that he [Mr. Vasquez] knew he was transporting drugs – either drugs or drug money?

MR. COX: Well, based on his statements to the federal agent?

THE COURT: Yes.

MR. COX: I think that he was afraid. I think that if he–

THE COURT: What's to be afraid of if you don't think you're taking drugs for money –

MR. COX: Because he was carrying money. I don't see that there's any direct or any circumstantial evidence that he knew the money was proceeds of any drug related activity.

THE COURT: So if somebody is carrying money and they don't think the money is tainted in any way and they're asked about it by law enforcement, why would they say, oh, I'm carrying cocaine or marijuana?

MR. COX: Well, it wasn't his money. It clearly wasn't his money.

THE COURT: Okay. But, I mean, give me a scenario where that is what would go through a person's mind. They're carrying money. Under your theory, he doesn't know where it came from; what's the source; he doesn't know if it's legit or not legit; he had just . . . some people gave him some money and said, we will give you a thousand dollars to transfer this money.

If that in itself doesn't raise some red flags, I mean, I think it does, but even if it didn't, why would he then report to law enforcement officers that he's transporting drugs?

Tr. of Sentencing Hr'g at 8-9; R. Vol. 2 at 12-13.

-16-

After further argument and discussion between the court and counsel, the court overruled the objection to the 6-level enhancement, concluding with the following explanation, directed specifically at Mr. Vasquez :

> THE COURT: So but why would somebody pay you a thousand dollars to take some luggage to El Paso? If everything is on the up and up, first, why would somebody pay a thousand dollars to get luggage to El Paso and why would they pay you to do it? . . . . If there was no drugs, if there was no illegal money, if there was no contraband involved, why wouldn't somebody just go to the Fed Ex store and pay $50 and mail it? Why would they ask you to drive that down there? . . . And so when a stranger says, I will pay you a thousand dollars to take my suitcase to El Paso, doesn't that make you have some concern about what's going on?

Id. at 23-24; R. Vol. 2 at 27-28. The district court's explanation clearly indicates why the court concluded that the government had established, by a preponderance of the evidence, that the 6-level enhancement applied. In short, we perceive no procedural unreasonableness in the district court's sentencing determination.[3]

---

[3]While Mr. Vasquez couches his challenge to his sentence as a challenge to its procedural reasonableness, we have also considered whether the sentence is substantively reasonable. We conclude that it is, in light of the sentencing factors contained in 18 U.S.C. § 3553(a), and in view of the deferential abuse-of-discretion standard applied to such a sentence.

## CONCLUSION

Having considered all of Mr. Vasquez's arguments, and for the foregoing reasons, we AFFIRM the sentence in this case.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge