**NOT RECOMMENDED FOR PUBLICATION**
File Name: 17a0065n.06
**Nos. 15-6444, 6445**
**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 25, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| JUANA EDITH VELA-SALINAS; | ) | DISTRICT OF TENNESSEE |
| ALDO VILLARREAL, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

BEFORE: GILMAN, GRIFFIN, and STRANCH, Circuit Judges.

GRIFFIN, Circuit Judge.

In this consolidated appeal, defendant Aldo Villarreal appeals his convictions for conspiracy to distribute controlled substances and conspiracy to commit money laundering, and defendant Juana Vela-Salinas appeals her conviction and sentence for conspiracy to commit money laundering. We affirm.

I.

Aldo Villarreal, with the help of his wife, Juana Vela-Salinas, operated a multi-state drug distribution and money-laundering scheme under the guise of a legitimate used-car business in south Texas. Villarreal would receive shipments of cocaine and marijuana from Mexico, which he then sent to his main buyer, Zeeshan Syed, in Tennessee and Georgia. Initially, he transported cocaine in small quantities (eight to twelve kilograms) using hidden compartments in

a car hauler that he drove to Nashville on a weekly basis. For larger shipments of 100 to 300 kilograms, however, Villarreal hired Moises Lopez to fly the product to a warehouse in Atlanta. Once delivered, Syed enlisted two men, Rodney Reed and Maurice Ferguson, to sell the product. Syed collected the proceeds and sent them back to Villarreal, usually in the same hidden compartments of the car hauler. Defendants funneled the proceeds of the drug conspiracy through their used-car business, El Shadai Auto Sales, by buying vehicles with the drug proceeds, accepting vehicles as payment for drugs, or depositing the drug proceeds into the business's bank accounts in quantities that resembled used-car sales. This process repeated itself, sometimes with bales of marijuana instead of bricks of cocaine. By 2011, Villarreal had orchestrated the transportation of hundreds of kilos of cocaine, hundreds of pounds of marijuana, and millions of dollars between Texas, Tennessee, and Georgia.

In retrospect, it was a single kilogram of cocaine that brought down the entire enterprise. In June 2010, someone low on the supply chain stole a kilogram of cocaine from a shipment and gave it to a friend to sell. That friend's buyer happened to be a confidential informant working with the DEA. That single-kilogram bust broadened into a ten-month investigation involving multiple state and federal agencies, which eventually culminated in an April 2011 indictment against Villarreal and fifteen members of his drug conspiracy. Two years later, a grand jury returned a second superseding indictment against Villarreal for conspiracy to possess with intent to distribute and to distribute five kilograms or more of cocaine and 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and against both Villarreal and Vela-Salinas for conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).

Nearly every member of the conspiracy pleaded guilty and testified against defendants. Syed recounted his agreements with Villarreal to buy hundreds of kilograms of cocaine and

hundreds of pounds of marijuana. He also recalled that Villarreal used drug money to purchase used cars from Syed or accepted used cars in exchange for drugs. Much of Syed's testimony was confirmed by his associates, Reed and Ferguson, both of whom identified Villarreal as Syed's source.

Moises Lopez testified about his agreement with Villarreal to fly over 500 kilograms of cocaine to Atlanta and to drive $340,000 of the proceeds back to Texas; how Villarreal, although rarely present with the cocaine, was always "in the general area," talking to him on the phone and directing him where to go; and how he helped Villarreal have hidden compartments installed in his vehicles.

Juan Aguilaro and Marybel Salazar, husband and wife and close family friends of the defendants, provided insight into defendants' operations in south Texas. Aguilaro told the jury about how Villarreal disclosed the details of his trafficking scheme to him, including who his buyer was (Syed), how much he sold cocaine for ($22,500 per kilo), and what he did with the proceeds (made improvements to the used car lot). Aguilaro also recalled seeing Villarreal handle cocaine about ten times, often putting it in the hidden compartments, and, on several occasions, seeing him with large amounts of cash after he returned from Nashville. According to both Aguilaro and Salazar, Vela-Salinas was "in charge of the finances." She told them how she would deposit less than $10,000 at a time (i.e., "structuring") to avoid detection by law enforcement. Both also testified that defendants frequently changed phones so "[their] calls could not be traced," and that defendants threatened to kill them and their family if they spoke to police.

The jury also learned about the lengthy investigation. Agents intercepted 15,248 wiretapped communications, some of which featured Villarreal discussing the terms of drug

deals. They conducted physical surveillance of conspiracy members in the Nashville and Atlanta area, on one occasion seizing over $2 million of Villarreal's drug money. Finally, an agent from the IRS, William DeSantis, conducted a forensic audit of defendants' personal and business financial records. Among other things, he reported that in 2009 Vela-Salinas deposited a total of $87,480 of cash into various bank accounts, roughly three times the amount of income defendants reported on their tax return for that year; between 2006 and 2011, defendants purchased over $1 million in used cars from other members of the drug conspiracy; and between 2008 and 2011 Vela-Salinas made numerous deposits below the $10,000 reporting limit, often in quick succession.

The jury convicted defendants as charged. The district court sentenced Villarreal to life in prison and Vela-Salinas to 20 years in prison—each's Guidelines range. Defendants appealed.

## II.

## A.

Villarreal argues that the district court violated his right to due process when it failed to provide an interpreter during a pretrial hearing and subsequently failed to provide a Spanish translation of the hearing transcript. Because defendant failed to raise this issue below, we review for plain error. *Puckett v. United States*, 556 U.S. 129, 135 (2009).

This claim is without merit. Even assuming the district court committed an error (an assumption we do not make lightly since defense counsel arguably invited any error by expressly agreeing with the court that defendant was not "impaired in any respect by the absence of a translator[,]" but instead would "be ordering a transcript so it can be translated for him"), defendant cannot establish prejudice. *Cf. id.* (requiring party raising unpreserved error to show it "affected the outcome of the district court proceedings"). Defendant contends he would have

entertained pleading guilty had he known the district court judge was so "hostile," but he fails to provide any citation to the record in support of his claim. The transcript shows Judge Haynes was nothing short of respectful toward the defense.

B.

Villarreal and Vela-Salinas argue that the district court erred in granting the government's motion to exclude the proposed testimony of their defense expert, John Crouch III. According to defendants' pretrial disclosure, Crouch was prepared to testify as an expert in the used car business of south Texas. The district court granted the government's motion because Crouch "did not investigate the defendant's [sic] business or review any of its records," and therefore defendants could not show that Crouch "reliably applied [his] principles and methods to the facts of the case." Fed. R. Evid. 702(d). It also declined to admit Crouch's testimony as a lay opinion under Rule 701 because it was based on "specialized knowledge." *Cf.* Fed. R. Evid. 701(c). We review the district court's decision for an abuse of discretion, *see United States v. Amawi*, 695 F.3d 457, 478 (6th Cir. 2012), and find none.

Villarreal argues the district court erred in not admitting Crouch's testimony under Rule 701, insisting that Crouch's testimony was not based on his "specialized knowledge." *Cf.* Fed. R. Evid. 701(c) (providing that lay opinion testimony is that which is "not based on . . . specialized knowledge within the scope of Rule 702"). However, defendants' pretrial disclosure of Crouch's "expert" testimony indicates otherwise. In it, Crouch describes his substantial experience buying and selling used cars in south Texas, how dealers purchase cars from other states where the vehicles are better maintained, rotating between auctions to disguise their bidding practices, and how consumers in south Texas predominantly use cash, requiring dealers to schedule multiple daily deposits to avoid robberies.

This testimony, Villarreal admits, "was offered for the purposes of assisting the jurors in understanding the intricacies of the used car business in South Texas which they otherwise would not possess." Put differently, Crouch's testimony was the product of reasoning by a "specialist in the field" of used-car sales in a particular locality. *United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007) (defining expert testimony as "result[ing] from a process of reasoning which can be mastered only by specialists in the field," as opposed to lay testimony, which "results from a process of reasoning familiar in everyday life"). The only authority offered in support of defendant's position—an unpublished decision from another circuit—is distinguishable for the simple fact that the lay witnesses in that case familiarized themselves with the specific records at issue in the case—something Crouch did not do. *Cf. United States v. Powers*, 578 F. App'x 763, 770 (10th Cir. 2014) (observing that "by the time of trial, [the witnesses] had become familiar with the specific loan documents").

Vela-Salinas's argument under Rule 701 is undeveloped. After quoting the rule, she states: "The proposed testimony is clearly admissible pursuant to Federal Rule of Evidence 701. The proposed testimony is exactly the type of testimony addressed by Federal Rule of Evidence 701." We consider her argument abandoned. *See United States v. Mack*, 808 F.3d 1074, 1079 n.2 (6th Cir. 2015). We therefore affirm the court's ruling under Rule 701.

Both defendants' arguments under Rule 702 suffer a similar fate. Below, the district court held that Crouch failed to review any of defendants' business records and therefore could not reliably apply his specialized knowledge to the facts of the case. *See* Fed. R. Evid. 702(d). Defendants do not discuss, let alone challenge, this basis for the district court's decision. Having failed to tell us why the district court abused its discretion, we decline to do it for them. *See Mack*, 808 F.3d at 1079 n.2. We therefore affirm the court's ruling under Rule 702.

C.

Next, both defendants claim that the government presented insufficient evidence to sustain their convictions. We review such claims de novo, asking whether "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

1.

Villarreal was convicted of conspiracy to possess with intent to distribute and to distribute five or more kilograms of cocaine and 100 or more kilograms of marijuana. "[T]o establish a drug conspiracy, the government must prove (1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy." *United States v. Colon*, 268 F.3d 367, 375 (6th Cir. 2001).

We need not recite every piece of evidence presented at trial to demonstrate that the government presented more than sufficient evidence to sustain defendant's conviction. We focus here on the government's two key witnesses: Syed and Lopez. Each testified that they formed agreements with Villarreal to distribute hundreds of kilograms of cocaine and hundreds of pounds of marijuana, and that Villarreal came to them with the idea. For instance, Syed recounted, "The first time that he comes, approached me, it was -- they was having problems somewhere in Atlanta, they have some cocaine which was not good enough. And they can't sell it. And he offered me that if I can sell it, he will -- he will do business with me." That agreement alone was for 40 to 46 kilograms of cocaine. Lopez made similar agreements with Villarreal to transport cocaine, though in much larger figures. Both also testified that Villarreal was hands-on: Villarreal personally delivered some of the shipments, attended a meeting

between Syed and his team, and was in "[c]onstant communication" with Lopez during each trip, directing him where to go and what to do with the shipment. Other eyewitnesses saw Villarreal load and unload cocaine and drug money from hidden compartments and vehicles.

Faced with this overwhelming evidence, Villarreal contends that the government's witnesses were not worthy of belief. "[A]ttacks on witness credibility," while they "make for effective closing arguments," fall on deaf ears here, for it is not our place to assess witness credibility or second-guess the jury's determinations on that score. *United States v. Adamo*, 742 F.2d 927, 935 (6th Cir. 1984). Instead, we take the evidence admitted at trial, view it in the light most favorable to the prosecution, and ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 366 U.S. at 319. Based on Syed's and Lopez's testimony that they entered into agreements with Villarreal to distribute hundreds of kilograms of cocaine and marijuana, that it was, in fact, at Villarreal's suggestion, and that Villarreal actively participated in all stages of the conspiracy, any rational juror could have found defendant guilty of the drug conspiracy.

2.

Both Villarreal and Vela-Salinas were convicted of conspiracy to commit money laundering. "To establish a money laundering conspiracy, the government must prove (1) that two or more persons conspired to commit the crime of money laundering, and (2) that the defendant knowingly and voluntarily joined the conspiracy." *United States v. Prince*, 618 F.3d 551, 553–54 (6th Cir. 2010). The government presented evidence that defendants agreed to funnel their ill-gotten proceeds through personal and business accounts in order to "promote the carrying on of" the drug scheme and to "disguise . . . the source . . . of the proceeds," often doing so in a way so as "to avoid a transaction reporting requirement under State or Federal law."

*See* 18 U.S.C. § 1956(a)(1)(A), (B). In 2009, for instance, the couple reported total income of $33,613, yet that same year Vela-Salinas deposited roughly three times as much cash into their personal accounts. Vela-Salinas also "structured" her banking activity by making multiple, successive deposits of less than $10,000 in order to avoid reporting the transaction to authorities. Indeed, according to Salazar, Vela-Salinas told her that was exactly what she was doing. Moreover, defendants used proceeds from the drug conspiracy to make improvements to their used car lot and to buy vehicles to sell as part of their used car business. The foregoing is more than sufficient to prove that defendants conspired to commit money laundering.

D.

Finally, Vela-Salinas argues her twenty-year prison sentence is substantively and procedurally unreasonable. We review the reasonableness of a sentence under the abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007).

Vela-Salinas's arguments regarding her sentence are perfunctory. She provides no support for any of her contentions. Typically, this court would not hesitate to deem her arguments waived for presenting them in such bare-boned fashion. *See United States v. Brown*, 819 F.3d 800, 829 (6th Cir. 2016) ("Issues . . . unaccompanied by some effort at developed argumentation[] are deemed waived." (bracketing omitted)). However, given the important liberty interests at stake, we have reviewed the record in the interest of justice and found that none of her assertions warrant relief.

The district court properly scored defendant's base offense level at 38. Under U.S.S.G. § 2S1.1(a)(1), the base offense level for a defendant convicted of money laundering is "[t]he offense level for the underlying offense from which the laundered funds were derived, if . . . [the defendant] would be accountable for the underlying offense under [U.S.S.G. § 1B1.3(a)(1)(A)]."

Section 1B1.3(a)(1)(A), in turn, provides that a defendant shall be held accountable for "all acts . . . aided, abetted, [or] counseled . . . by the defendant[.]" The district court found that Vela-Salinas ordered Aguilaro to destroy cell phones used in the drug conspiracy, as well as the license plates associated with vehicles either purchased with drug money or accepted as payment for drugs. She was also observed accepting drug money and counting it on several occasions. This was sufficient to prove by a preponderance of the evidence that Vela-Salinas actively "aided, abetted, [or] counseled" Villarreal in his conspiracy to distribute drugs, U.S.S.G. § 1B1.3(a)(1)(A), thereby making drug conspiracy her base offense level, U.S.S.G. § 2S1.1(a)(1).

The district court also properly applied a two-point enhancement for "sophisticated laundering." *See* U.S.S.G. § 2S1.1(b)(3). According to the application notes, "sophisticated" laundering "typically involves the use of . . . two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate[.]" U.S.S.G. § 2S1.1 cmt. n.5. Here, defendant's scheme involved three, sometimes even four, layers of laundering: cash from drug sales was converted into used vehicles, which were then converted back into cash, which was then deposited into various personal and business bank accounts in "structured" amounts, some of which was then transferred into other accounts. All of this was done to create the appearance of legitimate used-car sales transactions. The district court properly applied this enhancement.

A preponderance of the evidence also supports the two-point enhancement for obstruction of justice. *See* U.S.S.G. § 3C1.1. After Vela-Salinas learned about the indictment in this case, she ordered Aguilaro to destroy their cell phones and the license plates associated with vehicles either purchased with drug money or accepted as payment for drugs. The district court

credited this testimony, a finding we have no basis to disturb. This is sufficient to support the two-point enhancement. *See* U.S.S.G. § 3C1.1 cmt. n.4 (listing as an example of obstructive conduct, "directing or procuring another person to destroy or conceal evidence that is material to an official investigation").

Regarding substantive reasonableness, defendant's sentence was within the Guidelines range of 240 months and is thus entitled to a presumption of reasonableness. *Rita v. United States*, 551 U.S. 338, 347 (2007). We have no reason to question that presumption in this case. Vela-Salinas laundered over a million dollars of drug money and threatened to kill witnesses, including children.

### III.

We affirm defendants' convictions and sentences.