**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 28, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JOSE DIAZ-MENERA,

    Defendant - Appellant.

No. 21-6127

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:20-CR-00159-JD-4)**
_____

Dean Sanderford, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Denver, Colorado, for Defendant-Appellant.

Nick Coffey, Assistant United States Attorney (Robert J. Troester, United States Attorney, with him on the brief), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

_____

Before **MORITZ**, **SEYMOUR**, and **EBEL**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

    Jose Diaz-Menera challenges his sentence for money laundering, arguing that the district court erroneously determined his base offense level under § 2S1.1(a)(1) rather than § 2S1.1(a)(2) of the United States Sentencing Guidelines (U.S.S.G. or the Guidelines). Section 2S1.1(a)(1) applies when a defendant convicted of money

laundering either committed or was personally involved in the underlying offense, and it calculates the defendant's base offense level using the offense level for the underlying offense. But if the defendant was not involved in the underlying offense, § 2S1.1(a)(2) applies, and it calculates the defendant's offense level according to the amount of laundered funds. Here, the district court applied § 2S1.1(a)(1) based on its finding that Diaz-Menera was a member of the underlying drug conspiracy. Diaz-Menera argues that such finding was insufficient to trigger application of § 2S1.1(a)(1) because he did not personally possess or distribute drugs. However, because we conclude that a drug conspiracy can be an underlying offense for purposes of applying § 2S1.1(a)(1), we find no error in the district court's sentencing decision. But because the government concedes Diaz-Menera's second argument—agreeing that it breached the plea agreement by failing to move for a one-level reduction under U.S.S.G. § 3E1.1(b)—we vacate Diaz-Menera's sentence and remand for resentencing.

## Background

Authorities encountered Diaz-Menera during an investigation of Jose Manual Aveja, an individual suspected of conducting a drug-trafficking operation that involved the shipment of drugs from Michoacán, Mexico, to Oklahoma City, Oklahoma, and the distribution of those drugs in and around Dallas and Fort Worth, Texas. One evening in May 2020, officers observed Aveja meet a white van in a public parking lot in Oklahoma City, remove something from the van, place it in his vehicle, and then leave the parking lot. Officers followed Aveja and eventually

2

stopped him in Texas, discovering four kilograms of methamphetamine in his vehicle.[1]

The officers also followed the white van, which drove to an Oklahoma City residence. As they surveilled the residence, they watched two other vehicles arrive, stay for a short time, and then leave. Officers conducted traffic stops of those two vehicles and identified their drivers: One was driven by Diaz-Menera, and the other was driven by his nephew, Bernabe Cendejas Ramirez. Officers found $99,900 in Diaz-Menera's vehicle, separated into individual bundles, and evidence of money laundering and false identification documents on Cendejas Ramirez's cellphone. At the residence itself, officers discovered over $400,000 (bundled in the same way as the $99,900), a gun, a drug ledger documenting over $1 million in drug sales over the prior five months, and a flattened cardboard box stained with methamphetamine residue. They also arrested two individuals at the residence, Omar Garcia-Mecina and Jesus Barrios-Blanco.

All four men waived their rights and spoke to law enforcement. As relevant here, Diaz-Menera said that—at the direction of an individual located in Michoacán, Mexico, that he knew only by a nickname—he collected U.S. currency from various locations in the United States and remitted it to Michoacán. As to this particular day, Diaz-Menera said that an individual at the Oklahoma City residence had asked him to take more than $400,000, but he agreed to take only $99,900.

---

[1] The government indicted Aveja in Texas for drug conspiracy.

Diaz-Menera said that he received $90 for every $1,000 he remitted and that he paid Cendejas Ramirez, among other family members, $40 for every $1,000 remitted. He further admitted that he and Cendejas Ramirez created and used false identifications to facilitate the money transfers; he estimated that he had laundered approximately $1.5 million over the previous seven or eight months. Diaz-Menera also admitted that he knew the money came from illegal activity, but he would not say what type of illegal activity. Cendejas Ramirez confirmed Diaz-Menera's account and further acknowledged that he believed the money came from illegal drug sales.

The government indicted all four men for conspiracy to distribute methamphetamine and conspiracy to launder money.[2] Diaz-Menera pleaded guilty to the money-laundering conspiracy, and in exchange, the government dismissed the drug-conspiracy count. Under the plea agreement, the government agreed that Diaz-Menera should receive the benefit of a two-level reduction in his offense level for acceptance of responsibility under U.S.S.G. § 3E1.1(a), as long as he complied with the plea agreement, committed no further crimes, and did not "falsely deny or frivolously contest relevant conduct." R. vol. 1, 40. The government also agreed to move for an additional one-level reduction under § 3E1.1(b) if that section applied, if the district court granted the two-level reduction under subsection (a), and if Diaz-Menera timely accepted the plea agreement.

---

[2] The government also indicted Barrios-Blanco and Garcia-Mecina for illegal firearm possession.

To calculate Diaz-Menera's base offense level, the presentence investigation report (PSR) first looked to the money-laundering guideline in U.S.S.G. § 2S1.1. Concluding that the laundered funds came from drug sales, the PSR applied § 2S1.1(a)(1) and looked to the guideline for drug conspiracy in U.S.S.G. § 2D1.1 to set Diaz-Menera's base offense level. In so doing, the PSR attributed 321 kilograms of methamphetamine to Diaz-Menera, calculated by adding the $1.5 million that Diaz-Menera admitted to laundering, the $99,900 found in his vehicle, and the over $400,000 found at the Oklahoma City residence, then dividing that total by a per-kilogram price of methamphetamine in Oklahoma City. The PSR therefore set Diaz-Menera's base offense level under the drug-conspiracy guideline at 38. And after various enhancements and the two- and one-level reductions under § 3E1.1(a) and (b), it set Diaz-Menera's total offense level at 43. The PSR further determined that with a criminal-history score of I, Diaz-Menera's Guidelines sentencing range was life in prison. But because the statutory maximum for Diaz-Menera's money-laundering conviction was 20 years, the PSR ultimately set his Guidelines range at 240 months. *See* 18 U.S.C. § 1956(a)(2)(B)(i) and (h).

Diaz-Menera objected to the PSR's calculation of his base offense level, arguing that relying on the drug-conspiracy guideline was improper because (1) he did not personally possess or distribute drugs, (2) he was not a member of the underlying drug conspiracy, and (3) aside from the $99,900 discovered in his vehicle, there was no evidence tying the other laundered funds to drug sales. The district court granted the objection in part. It first concluded that using the drug-conspiracy

5

guideline was appropriate because Diaz-Menera was a member of the underlying drug conspiracy and because "some of the laundered funds were proceeds from the sale of methamphetamine for which he can be accountable." R. vol. 3, 79. But it limited the relevant quantity of methamphetamine attributable to Diaz-Menera to just over 15 kilograms, based on the $99,900 in Diaz-Menera's vehicle that was most strongly and obviously connected to the sale of methamphetamine. The district court declined to connect the other amounts of money to drugs, noting "[t]he government simply ha[d] not presented enough" evidence to conclude that all of the other laundered funds derived from methamphetamine sales. *Id.* at 93–94.

Thus, the district court determined that Diaz-Menera's base offense level was 36, applied various enhancements not at issue in this appeal, and granted the two-level reduction in § 3E1.1(a) for acceptance of responsibility. When it asked the government about moving for an additional one-level reduction under § 3E1.1(b), the government declined, citing Diaz-Menera's "frivolous objections" to the PSR. *Id.* at 107. Ultimately, the district court set Diaz-Menera's offense level at 39, resulting in a Guidelines range of 262 to 327 months, effectively capped at 240 months by the statutory maximum for Diaz-Menera's money-laundering conviction. *See* § 1956(a)(2). The district court then granted a downward variance and imposed a sentence of 168 months.[3]

---

[3] The district court did not impose a term of supervised release, noting that doing so was not ordinarily appropriate when the defendant—like Diaz-Menera in this case—will face an immigration detainer upon release from prison.

Diaz-Menera appeals.

## Analysis

### I.     Base Offense Level for Money Laundering

Diaz-Menera challenges the district court's decision to calculate his base

offense level for money laundering under § 2S1.1(a)(1)—a legal conclusion that we

review de novo. *See United States v. Nkome*, 987 F.3d 1262, 1268 (10th Cir. 2021).

Section 2S1.1 provides two options for setting the base offense level. Under

subsection (a)(1), the base offense level is determined by looking to "[t]he offense

level for the underlying offense from which the laundered funds were derived."

§ 2S1.1(a)(1). As relevant here, subsection (a)(1) applies only if "the defendant

committed the underlying offense" or if the defendant "would be accountable for the

underlying offense under" the direct-commission subsection of the relevant-conduct

guideline, U.S.S.G. § 1B1.3(a)(1)(A). *Id.* If neither of these conditions is satisfied,

then the base offense level is calculated under subsection (a)(2), by reference to "the

value of the laundered funds."[4] § 2S1.1(a)(2).

Diaz-Menera contends that the district court erred in applying § 2S1.1(a)(1)

because he did not personally possess or distribute drugs. That is, he argues that

---

[4] Previously, "§ 2S1.1 set the base offense level for all money launderers according to the amount of funds laundered." *United States v. Glass*, 189 F. App'x 788, 795 (10th Cir. 2006); *see also* U.S.S.G. § 2S1.1 (2000). But in 2001, § 2S1.1 "was amended to its present form in order to distinguish between 'direct money launderers' and 'third[-]party launderers.'" *Glass*, 189 F. App'x at 795 (quoting U.S.S.G. Supp. to App. C, Amend. 634, at 227–28 (2002)). The intent behind the amendment was to punish direct money launderers more severely based on their greater involvement in the underlying offense. *See id.* at 795–96.

§ 2S1.1(a)(1) does not apply to him because he did not "commit[] the underlying offense" and also cannot be held "accountable for the underlying offense under" the direct-commission subsection of the relevant-conduct guideline. § 2S1.1(a)(1). Yet, as the government points out, the district court expressly found that even though Diaz-Menera did not personally possess or distribute drugs, he nevertheless committed overt acts in furtherance of the underlying drug conspiracy by laundering over $1.5 million for that drug conspiracy. In other words, the district court determined that Diaz-Menera "committed the underlying offense" as required under § 2S1.1(a)(1) because he was a member of the underlying drug conspiracy.[5] *Id.*

Importantly, Diaz-Menera does not argue on appeal that the district court clearly erred in finding that he was a member of the underlying drug conspiracy. Instead, the success of his appellate argument—that § 2S1.1(a)(1) does not apply because he did not personally possess or distribute drugs—rests on the alternative premise that only drug possession or distribution, not drug conspiracy, can be an "underlying offense from which the laundered funds were derived" under § 2S1.1(a)(1).[6] In support, Diaz-Menera argues that allowing a drug conspiracy to

---

[5] This finding accords with the indictment, which specifically contemplated that the offense underlying Diaz-Menera's money laundering was the drug conspiracy: He pleaded guilty to a money-laundering conspiracy in which the laundered funds were proceeds of "the felonious buying, selling, and dealing in controlled substances *and conspiring to do the same*." R. vol. 1, 13 (emphasis added).

[6] For the first time at oral argument, the government argued that Diaz-Menera conceded in the district court that a drug conspiracy could be an "underlying offense" under § 2S1.1(a)(1) and thus urged us to find invited error. *See United States v. LaHue*, 261 F.3d 993, 1011 (10th Cir. 2001) ("The invited[-]error doctrine prevents a

serve as the underlying offense is inconsistent with § 2S1.1(a)(1)(A), which defines direct money launderers as those who either "commit[] the underlying offense" or "would be accountable for the underlying offense under" the direct-commission subsection of the relevant-conduct guideline at § 1B1.3(a)(1)(A). In particular, Diaz-Menera points out § 2S1.1(a)(1)(A)'s limited incorporation of relevant conduct under § 1B1.3(a)(1)(A), noting that § 2S1.1(a)(1)(A) omits mention of the joint-undertaking subsection of the relevant-conduct guideline at § 1B1.3(a)(1)(B)—a broad provision that holds defendants responsible not just for their own acts but, under certain circumstances, for the acts of others. According to Diaz-Menera, § 2S1.1(a)(1)(A)'s omission of joint-undertaking liability means that a joint-undertaking crime, such as a drug conspiracy, cannot be the underlying offense from which the laundered funds were derived; he contends that concluding otherwise would effectively negate § 2S1.1(a)(1)(A)'s limited incorporation of relevant conduct.

---

party from inducing action by a court and later seeking reversal on the ground that the requested action was in error." (quoting *United States v. Edward J.*, 224 F.3d 1216, 1222 (10th Cir. 2000))). The government also argued that we should overlook its failure to make this argument in its response brief because Diaz-Menera did not articulate his position that a drug conspiracy cannot be the underlying offense for money laundering until his reply brief. *See United States v. De Vaughn*, 694 F.3d 1141, 1154–55 & 1154 n.9 (10th Cir. 2012) ("It is well-settled that arguments inadequately briefed in the opening brief are waived." (quoting *United States v. Cooper*, 654 F.3d 1104, 1128 (10th Cir. 2011))). But the government's invited-error argument is based on defense counsel's statements at sentencing, not on Diaz-Menera's failure to articulate his position until his reply brief. Moreover, Diaz-Menera's argument has not shifted over time; his consistent position has been that the drug-conspiracy guideline does not apply because he did not personally possess or distribute drugs. We therefore reject the government's invited-error argument both because the government waived any such argument by failing to include it in the response brief and because Diaz-Menera did not invite error.

But Diaz-Menera's argument overlooks that there are two different ways to satisfy § 2S1.1(a)(1)(A). This provision directs the court to the guideline for the underlying offense if the defendant *either* (1) "committed the underlying offense" *or* (2) "would be accountable for the underlying offense" by way of the direct-commission subsection of the relevant-conduct guideline. § 2S1.1(a)(1)(A). Diaz-Menera focuses exclusively on the latter, but the relevant-conduct limitation does not preclude holding a defendant responsible under the former for his or her own conduct in joining a drug conspiracy and thereby "committ[ing] the underlying offense." *Id.* Stated differently, the only way a drug conspiracy could function as the underlying offense from which the laundered funds were derived is if the district court finds—as it did here—that the defendant was a member of the drug conspiracy. And although such a conclusion may ultimately result in a defendant being held responsible for conduct of other drug-conspiracy members, that conclusion only *follows* from holding the defendant responsible for his or her own conduct in joining the conspiracy; this is not the same as applying § 2S1.1(a)(1)(A) by *beginning* with the premise that the defendant is responsible for the acts of others under the joint-commission relevant-conduct guideline. Treating a drug conspiracy as the underlying offense therefore does not offend § 2S1.1(a)(1)(A)'s direction to use the base offense level for the underlying offense from which the laundered funds were derived only if

the defendant actually committed the underlying offense or would be responsible under the direct-commission subsection of the relevant-conduct guideline.[7]

Maintaining his counterargument, Diaz-Menera points to *United States v. Morales*, 108 F.3d 1213 (10th Cir. 1997). The defendant there was convicted of both money laundering and drug conspiracy. *Id.* at 1215–16. And the district court calculated the Guidelines range based on the defendant's "involvement in money laundering, rather than pursuant to his conviction of conspiracy," because it concluded that the government did not present evidence establishing any quantity of drugs attributable to him. *Id.* at 1218. The government challenged that reasoning on appeal. We affirmed, however, finding that the district court properly sentenced the defendant pursuant to the money-laundering guideline because its determination that the defendant was not "directly involved" with any quantity of drugs—as required by the commentary to the direct-commission relevant-conduct guideline,

---

[7] The dissent relatedly suggests that treating conspiracy as the underlying offense "render[s] subsection (a)(2) practically superfluous" because it "eliminates the concept of an independent third-party money launderer, meaning that there would be no case in which the money-laundering defendant who only offered independent money-laundering services—even to several drug organizations—did not commit the 'underlying offense' of subsection(a)(1)." Dissent 3–4 (footnote omitted). But this overlooks that a money-laundering defendant may be acquitted of any underlying drug conspiracy, or the government may fail to prove at sentencing that the defendant was a member of the underlying conspiracy. In such instances, a money-laundering defendant would be sentenced under subsection (a)(2). *See United States v. Vasquez*, 603 F. App'x 722, 729 (10th Cir. 2015).

§ 1B1.3(a)(1)(A)—was not clearly erroneous: Indeed, the government had failed to present any evidence tying the defendant to any drugs.[8] *Id.* at 1218, 1226–27.

Diaz-Menera says *Morales* means he similarly cannot be held accountable for any underlying quantity of drugs under § 2S1.1(a)(1) and § 1B1.3(a)(1)(A). But his assertion fails to appreciate critical distinctions between *Morales* and this case. As an initial matter, *Morales* predates the 2001 amendments to § 2S1.1 and thus provides little guidance on the precise question presented in this appeal: whether drug conspiracy can serve as the underlying offense for purposes of § 2S1.1. *See supra* note 4. In fact, we did not even discuss or cite § 2S1.1 in *Morales*; we simply reviewed whether the district court clearly erred in failing to determine that the defendant was directly involved in the distribution of a particular quantity of drugs. Further, and in direct contrast to the findings on review in *Morales*, the district court here found that there *was* evidence connecting Diaz-Menera's money laundering to a quantity of drugs: the $99,900 discovered in his vehicle that came from a house containing a significant drug ledger, drug residue, a gun, and more similarly bundled cash. And recall that Diaz-Menera does not argue that the district court's factual findings were clearly erroneous. Thus, in sum, *Morales* does not address whether

---

[8] We also found no clear error in the district court's conclusion that no quantity of drugs was "reasonably foreseeable" to the defendant under § 1B1.3(a)(1)(B), noting that although "the record may have permitted the district court" to convert the amount of cash laundered into a quantity of drugs, the district court was not "obligated to do so." *Morales*, 108 F.3d at 1227. The government highlights this portion of *Morales*, but as Diaz-Menera points out in his reply, this discussion in *Morales* is irrelevant here because § 1B1.3(a)(1)(B) has no application to this case.

conspiracy can be the underlying offense for purposes of § 2S1.1; nor does it prohibit the district court's decision to allocate a quantity of drugs to Diaz-Menera based on the evidence presented here.

Diaz-Menera next relies on commentary to the money-laundering guideline to argue that he is not a direct money launderer under § 2S1.1(a)(1). The commentary explains: "The fact that the defendant was involved in laundering criminally derived funds after the commission of the underlying offense, *without additional involvement in the underlying offense*, does not establish that the defendant committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused the underlying offense." § 2S1.1 cmt. n.2(B) (emphasis added). Diaz-Menera contends that this commentary describes his role: "[H]e simply picked up drug proceeds after the transaction was completed." Rep. Br. 8. But as the government responds, Diaz-Menera both assumes that only drug *distribution* can be the relevant underlying offense and "downplays his role in the underlying drug conspiracy." Aplee. Br. 21. The government's evidence established that Diaz-Menera laundered more than $1.5 million over seven or eight months in furtherance of a broad, international drug conspiracy, used false documents to do so, and recruited family members to assist him in carrying out the conspiracy's objectives. That Diaz-Menera did not personally possess or distribute the drugs in carrying out those objectives does not negate his direct involvement in the conspiracy as a whole, nor does it establish that he lacked "additional involvement in the underlying offense." § 2S1.1 cmt. n.2(B).

13

Notably, it appears that no circuit court has squarely addressed whether a drug conspiracy can function as the underlying offense for purposes of § 2S1.1(a)(1). We have, however, implicitly assumed that a drug conspiracy can be an underlying offense, affirming the application of § 2S1.1(a)(1) where the defendant admitted in her plea agreement that she was part of the uncharged, underlying drug conspiracy. *See Glass*, 189 F. App'x at 791, 793, 796.[9] And by contrast, where a jury convicted a defendant of money laundering but acquitted him of the underlying drug conspiracy, we noted that the defendant's base offense level was properly calculated under § 2S1.1(a)(2) because the defendant "did not commit the underlying offense (drug trafficking) for which the moneys were laundered." *Vasquez*, 603 F. App'x at 729.[10]

---

[9] The dissent questions whether *Glass* includes any such assumption, highlighting that the defendant there pleaded guilty to four drug offenses (two conspiracies and two possession-with-intent counts) in addition to money laundering. But we plainly stated in *Glass* that "we agree with [the defendant] that the 'underlying offense from which the laundered funds were derived' is [the conspiracy] described in the information" and *not* the drug counts to which she pleaded guilty. 189 F. App'x at 793. And we found subsection (a)(1)'s "first condition"—that the defendant committed the underlying offense—"clearly met" because the defendant "admitted in her plea that the laundered funds" derived from the drug conspiracy she was involved in. *Id.* Indeed, contrary to the dissent's assertion "that mere membership in a drug conspiracy" cannot be an '"underlying offense' for the purposes of subsection (a)(1)," Dissent 5, we expressly said that "[s]ubsection (a)(1) applies . . . if [the defendant] *was a member* of th[e] conspiracy," *Glass*, 189 F. App'x at 793 (emphasis added). We therefore assumed that conspiracy can be the underlying offense when calculating the offense level for money laundering. And we only relied on the defendant's other drug convictions when discussing subsection (a)(1)'s second condition, "whether the offense level for the underlying offense can be determined." *Id.* at 794.

[10] The dissent emphasizes that "the undisputed facts of *Vasquez* show that the defendant there was no more involved in the drug distribution than Diaz-Menera." Dissent 6. That may be the case as to the underlying facts, but subsection (a)(2) was

14

The Sixth Circuit has likewise treated drug conspiracy as the underlying offense, rejecting no-personal-involvement arguments very similar to Diaz-Menera's arguments here. *See United States v. Anderson*, 526 F.3d 319, 325 (6th Cir. 2008) (affirming use of drug-conspiracy guideline to calculate base offense level because although there was "no evidence that [defendant] personally sold narcotics, her conduct did further the drug conspiracy to sell the narcotics and she was, therefore, responsible for the drug conspiracy"); *United States v. Vela-Salinas*, 677 F. App'x 224, 231 (6th Cir. 2017) (affirming use of drug-conspiracy guideline to calculate base offense level for money laundering because evidence showed that defendant aided or abetted uncharged, underlying drug conspiracy).

Caselaw therefore provides little guidance, leaving us with Diaz-Menera's reliance on the relevant-conduct limitation in § 2S1.1(a)(1)(A) and the guideline's commentary. For the reasons we have explained, we do not find these arguments persuasive.[11] We therefore reject Diaz-Menera's argument that drug conspiracy

---

the appropriate guideline in *Vasquez* because the defendant was *acquitted* on such facts; here, by contrast, subsection (a)(1) is appropriate because the district court found the facts sufficient to conclude by a preponderance of the evidence that Diaz-Menera committed the underlying conspiracy. And again, Diaz-Menera doesn't challenge the district court's factual conclusion.

[11] Highlighting that the relevant underlying offense is "the underlying offense *from which the laundered funds were derived*," Diaz-Menera argues in passing that drug conspiracy cannot be an underlying offense because it is an inchoate offense from which no funds are derived. § 2S1.1(a)(1) (emphasis added). Instead, according to Diaz-Menera, the only offense from which funds are derived is the actual drug distribution. The dissent takes this same view, but we are not persuaded. To be sure, funds will not *necessarily* be derived from an agreement to distribute drugs. But as a practical matter, funds are routinely derived from such agreements, as demonstrated

cannot be the underlying offense from which the laundered funds were derived for purposes of § 2S1.1(a)(1). And because Diaz-Menera does not challenge the district court's factual finding that he was a member of the underlying drug conspiracy, the district court did not err in using the drug-conspiracy guideline to set his base offense level for money laundering.

## II.    Breach of Plea Agreement

Diaz-Menera also argues that the government plainly breached the plea agreement when it failed to move for a one-level reduction under § 3E1.1(b). *See United States v. Wolfname*, 835 F.3d 1214, 1217 (10th Cir. 2016) (explaining plain-error review of issues not raised at district court). To determine whether the government violated the plea agreement, we "examine the nature of the promise" and evaluate that promise "in light of the defendant's reasonable understanding" of such promise. *United States v. Villa-Vazquez*, 536 F.3d 1189, 1196 (10th Cir. 2008) (quoting *United States v. Guzman*, 318 F.3d 1191, 1195–96 (10th Cir. 2003)). Here, the plea agreement provided that the government would move for a one-level reduction under § 3E1.1(b) if three conditions were met, and all three were. The government therefore plainly breached the plea agreement when it declined to move for the reduction. And this plain error affected Diaz-Menera's Guidelines range and therefore his substantial rights; reversal is required to protect the integrity of judicial

---

by the facts of this case: The conspiracy here was an agreement to distribute drugs, and it does no violence to the guideline's language to conclude that after the agreed-upon drug distribution took place, the money obtained derived from the conspiratorial agreement as well as from the distribution itself.

proceedings. *See Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016) (noting that error causing incorrect Guidelines range typically affects substantial rights); *United States v. Cudjoe*, 534 F.3d 1349, 1357 (10th Cir. 2008) (stating that when government fails to fulfill its promise, integrity demands correction). Indeed, the government concedes this issue, "acknowledg[ing] that it breached the plea agreement and [asking] that this case . . . be remanded for resentencing so that it can comply with its obligations under the plea agreement." Aplee. Br. 25–26. We accordingly conclude that the government breached the plea agreement, vacate Diaz-Menera's sentence, and remand for resentencing.

## Conclusion

Because the district court found that Diaz-Menera was a member of the underlying drug conspiracy, it did not err in using the drug-conspiracy guideline to calculate the base offense level for Diaz-Menera's money-laundering offense under § 2S1.1(a)(1). We nevertheless vacate Diaz-Menera's sentence and remand for resentencing so that the government can fulfill the § 3E1.1(b) promise it made in the plea agreement.

No. 21-6127, <u>United States v. Diaz-Menera</u>

**EBEL**, J., dissenting in part

The majority's opinion permits a drug-money launderer to be sentenced for the distribution of drugs even though the money launderer played no part in drug distributions. This cannot be right, nor can it be squared with our precedent. Instead, I would remand this case to the district court for resentencing without this enhancement.

## I.     The "Underlying Offense" Of § 2S1.1(a)(1) Does Not Mean Membership In A Drug Conspiracy For Which The Defendant Only Laundered Funds And Did Not Participate In The Underlying Drug Transactions.

This case turns on the text of U.S.S.G. § 2S1.1, subparts (a)(1) and (a)(2). These provisions read as follows:

(a) Base Offense Level:

(1) The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of § 1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined; or

(2) 8 plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds, otherwise.

The majority's opinion relies entirely upon an erroneous premise: that the "underlying offense" referenced in subsection (a)(1) includes membership in a drug

conspiracy. (Op. 7–8.)[1] This premise is mistaken for two reasons. First, the "underlying offense" referenced in subsection (a)(1) by the Guideline language must be the offense "from which the laundered funds were derived." U.S.S.G. § 2S1.1(a)(1) (emphasis added). For conspiracy, "the criminal agreement itself is the actus reus." United States v. Shabani, 513 U.S. 10, 16 (1994). A conspiracy by itself does not produce any funds. Rather, the funds are derived from underlying actual drug sales, not the mere conspiratorial agreement. Hence, the laundered funds here were not "derived" from the conspiracy (which was a conduit through which drug proceeds were distributed after they were "derived" from the drug transactions). The funds were "derived" (e.g., generated or obtained) from the drug transactions which generated the funds. Cf. United States v. Tee, 881 F.3d 1258, 1270 (10th Cir. 2018) (federal money-laundering statute is only violated if the "transaction generating the criminally derived proceeds is distinct from the money-laundering transaction"); see also United States v. Seward, 272 F.3d 831, 836 (7th Cir. 2001) (" . . . the money laundering statutes criminalize 'transaction[s] in proceeds, not the

---

[1] I assume, without deciding, whether Diaz-Menera can be considered a member of the drug conspiracy for the purposes of this section because Diaz-Menera does not appear to challenge this finding on appeal. But it is far from clear that Diaz-Menera was in fact a member of the drug conspiracy. The drug conspiracy charge against Diaz-Menera was dismissed, (R. vol. II, at 64), and to be a member of the drug conspiracy, there must be evidence that Diaz-Menera knew "both that the drug conspiracy existed and that the peripheral service being furnished was designed to foster the conspiracy," United States v. Brown, 730 F. App'x 638, 647 (10th Cir. 2018) (unpublished) (citing United States v. Garcia-Torres, 280 F.3d 1, 4 (1st Cir. 2002)). My analysis therefore only assumes arguendo that Diaz-Menera was a member of the separate drug conspiracy.

2

transaction[s] that create [ ] the proceeds.'" (quoting United States v. Mankarious, 151 F.3d 694, 705 (7th Cir.1998))).

The majority's reading of § 2S1.1 also undermines the division between subsections (a)(1) and (a)(2), thereby rendering subsection (a)(2) practically superfluous. Subsection (a)(1) instructs that a money-laundering defendant should be sentenced according to the underlying offense if the defendant either "committed the underlying offense" or "would be accountable for the underlying offense" under U.S.S.G. § 1B1.3(a)(1)(A). In contrast, as explained in the Guidelines Manual, subsection (a)(2) applies "to any case in which (i) the defendant did not commit the underlying offense; or (ii) the defendant committed the underlying offense (or would be accountable for the underlying offense under § 1B1.3(a)(1)(A)), but the offense level for the underlying offense is impossible or impracticable to determine." U.S.S.G. § 2S1.1(a)(1)(A) cmt. 3(A). If subsection (a)(2) applies, then the defendant is sentenced only according "to the value of the laundered funds." This makes sense because, in that context, money laundering would be the only criminal activity participated in by the defendant, so the punishment should be tied to the amounts laundered. Id. § 2S1.1(a)(2).

In fact, prior to 2001, all money launderers were sentenced only according to the value of the actual laundered funds. United States v. Glass, 189 F. App'x 788, 795 (10th Cir. 2006) (unpublished). The division between subsections (a)(1) and (a)(2) was specifically created to "distinguish between 'direct money launderers' and 'third party launderers.'" Id. (quoting U.S.S.G. Supp. to App. C, Amend. 634, at 227–28 (2002) [sic] (emphasis added)); see U.S.S.G. Supp. to App. C, Amend. 634, at 223–24 (2002).

3

"Direct money launderers are those who <u>also</u> commit the <u>crime</u> that <u>produces</u> the <u>illicit</u> <u>funds</u>, whereas third party launderers have no involvement in the underlying offense-they only launder the money generated from that offense." <u>Id.</u> (emphasis added).

Considering this history, I do not see how the conspiracy itself could be the "underlying offense" in § 2S1.1(a)(1), since even those third-party money launderers that "only launder the money" would then be treated as direct money launderers because they could be deemed to be members of the conspiracy. <u>See id.</u>  Under the majority ruling, either a money-laundering defendant distributes the drugs and launders money himself (in which case he is a direct money launderer), or he is deemed to have joined the drug distribution as an unavoidable consequence of providing a service to the drug conspiracy and is therefore also a direct money launderer.  This eliminates the concept of an independent third-party money launderer,[2] meaning that there would be no case in which the money-laundering defendant who only offered independent money-laundering services—even to several drug organizations—did not commit the "underlying offense" of subsection (a)(1).  This reading would render subsection (a)(2) superfluous in every case except for one (not present here) where "the offense level for the underlying offense is impossible or impracticable to determine."  U.S.S.G. § 2S1.1(a)(1)(A) cmt. 3(A); <u>see</u> <u>also Glass</u>, 189 F. App'x at 795; <u>United States v. Vasquez</u>, 603 F. App'x 722, 729 (10th

---

[2] Analogous perhaps to an independent banker who provides a separate service of financing to a farmer in order to allow the farmer to continue farming.  The banker is not, as a result, considered to have become a partner in the farming activity, or whatever entity is used by the farmer to farm.

4

Cir. 2015) (unpublished) (defendant was sentenced under subsection (a)(2) because he "did not commit the underlying offense (drug trafficking) for which the moneys were laundered").

Based on the textual distinction between subsections (a)(1) and (a)(2), then, I disagree with the majority that mere membership in a drug conspiracy—without regard to the defendant's actions or nonparties pertaining to the underlying drug activity—can constitute the "underlying offense" for the purposes of subsection (a)(1). See United States v. Bunner, 134 F.3d 1000, 1006 n.5 (10th Cir. 1998) (rejecting an interpretation of U.S.S.G. § 2K2.1(b)(5) that would render a phrase "meaningless").

The caselaw does not support the majority. The majority claims that, in Glass, we made the implicit assumption that a drug conspiracy alone could constitute the underlying offense for the purposes of § 2S1.1(a)(1). (Op. 13 (citing 189 F. App'x at 791, 793, 796).) But, Glass did not involve a defendant who merely laundered money for a drug conspiracy. Rather, the defendant pleaded guilty to multiple conspiracies to possess and distribute drugs, possession of drugs with intent to distribute, and a conspiracy to launder money. 189 F. App'x at 790–91. Moreover, even though we said that "subsection (a)(1) applies. . . if the defendant was a member of the conspiracy," we highlighted the fact that the defendant admitted in her plea "that the laundered funds 'were proceeds from defendant Fife's drug trafficking in which [she] was involved.'" Id. at 793 (emphasis in original). We recognized that the defendant "pleaded guilty to the four drug counts in the indictment," and thus concluded that her conduct fell "squarely within § 1B1.3(a)(1)(A) as an act committed by the defendant." Id. at 795. Thus, despite some language in the

5

opinion, it does not appear that we held that mere membership in a drug conspiracy constituted the "underlying offense" for the purposes of § 2S1.1(a)(1) because that did not appear to be the facts of that case.

This aligns with our decision in Vasquez, which the majority recognizes in a footnote. (Op. 14 n.9.)  There, we concluded that subsection (a)(2) was the proper subsection to apply when the defendant was convicted of money laundering but acquitted of the underlying drug conspiracy.  Specifically, we concluded that (a)(2) was appropriate because the defendant "did not commit the underlying offense (drug trafficking) for which the moneys were laundered."  603 F. App'x at 729.  So too here, as the undisputed facts of Vasquez show that the defendant there was no more involved in the drug distribution than Diaz-Menera.  In Vasquez, the government learned that an individual would be paying for a prior shipment of cocaine, and then observed the Vasquez defendant getting into that individual's car and receiving a black duffle bag full of cash. Id. at 724.  Diaz-Menera's actions were just as disconnected from the drug distributions as the defendant's acts in Vasquez (if not more so).  The majority decision would effectively nullify Vasquez by ensuring that a future defendant in a similar situation will be sentenced under subsection (a)(1).

Finally, the majority cites two Sixth Circuit decisions that it claims have treated drug conspiracy as the underlying offense.  The first is United States v. Anderson, 526 F.3d 319, 324 (6th Cir. 2008), in which the Sixth Circuit concluded that the defendant was responsible for the underlying drug conspiracy because she allowed another party to conduct his methamphetamine operations in her house.  Although there

6

was no evidence that the defendant "personally sold narcotics," the Sixth Circuit concluded that her conduct furthered the drug conspiracy and thus that she could be held responsible for the actions of the drug conspiracy under § 2S1.1(a)(1). Id. at 325. Anderson did not involve a money-laundering defendant who was disconnected from the distribution of drugs. The defendant received shipments of narcotics to her house—for which she would sometimes retrieve money to pay—and acted as a courier for the drug proceeds. Id. at 324. For this reason, it was appropriate to hold that defendant responsible for the actions of the drug conspiracy under § 2S1.1(a)(1), given that she was directly involved in the underlying offense of drug distribution. Notwithstanding this difference in the holding, I do acknowledge that Anderson contains language supportive of our majority's holding. To that extent, I would not follow Anderson.

The decision in United States v. Vela-Salinas, 677 F. App'x 224 (6th Cir. 2017), is less helpful to the majority. There, the Sixth Circuit concluded that a defendant aided and abetted a drug distribution conspiracy under § 2S1.1(a)(1) by ordering the destruction of evidence (like phones and license plates used in drug transactions), and by accepting drug money and counting it. Id. at 231. Like before, this was not a defendant who acted as a third-party money launderer. Rather, the Vela-Salinas defendant took active steps to aid and abet the distribution of drugs. The same cannot be said for Diaz-Menera.

For the reasons explained above, the majority's key premise—that Diaz-Menera can be held responsible for the distribution of drugs solely by virtue of his membership in the conspiracy as a money launderer—is, in my opinion, erroneous. I believe the

7

underlying offense to which § 2S1.1(a)(1) refers must be the distribution of drugs, rather than the conspiracy, since that is the crime that actually generated the funds at issue.

If § 2S1.1(a)(1) had intended the "conspiracy" to be the operative event, it would have used that word. Instead, it used the words "underlying offense." Had § 2S1.1(a)(1) used the word "conspiracy," the majority opinion would be easy to defend. But here, § 2S1.1(a)(1) used the phrase "<u>underlying offense</u>"—not just any offense, but rather a specific underlying criminal offense that occurred under the overarching conspiracy. Here, the "underlying offense" could only mean one thing: the specific illegal drug transactions that underlay and supported the overarching crime of conspiracy.

## II.    Diaz-Menera Cannot Be Held Responsible For The Drug Distribution.

The question then is whether Diaz-Menera can be held responsible for the underlying offense of drug distribution in some other way. I believe he cannot.

The majority seems to agree that Diaz-Menera cannot otherwise be held "accountable" for the drug distribution under § 2S1.1(a)(1). (Op. 10-11.) As the majority recognizes, a defendant can only be held alternatively accountable if he or she "would be accountable for the underlying offense under <u>subsection (a)(1)(A)</u> of § 1B1.3." U.S.S.G. § 2S1.1(a)(1) (emphasis added). This explicit cross-reference to subsection (a)(1)(A) of § 1B1.3 is critical, since subsection (a)(1)(A) only encompasses acts or omissions "caused by the defendant." The Sentencing Commission conspicuously did not cross-reference subsection (a)(1)(B) of § 1B1.3, which extends to the acts and omissions of co-conspirators that were, among other things, "reasonably foreseeable" to the defendant. Hence, the plain text of § 2S1.1(a)(1) indicates that a money launderer can

8

only face an enhanced sentence for his or her own acts of drug distribution, but not for the reasonably foreseeable acts of co-conspirators. See Collins v. Yellen, 141 S. Ct. 1761, 1782 (2021) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); see also U.S.S.G. § 2S1.1 cmt. 2(B) ("The fact that the defendant was involved in laundering criminally derived funds after the commission of the underlying offense, without additional involvement in the underlying offense, does not establish that the defendant" is accountable for the offense); U.S.S.G. § 1B1.3 cmt. 2 (a defendant is accountable under subsection (a)(1)(A) "for all quantities of contraband with which he was directly involved" (emphasis added)).

This reference to § 1B1.3(a)(1)(A) means that Diaz-Menera cannot be held "accountable" for the drug distribution solely on account of his money laundering. It seems to me that our decision in United States v. Morales, 108 F.3d 1213 (10th Cir. 1997), is dispositive on this front. There, we refused to hold the defendant accountable for the distribution of drugs under § 1B1.3(a)(1)(A)—the subsection cross-referenced by § 2S1.1(a)(1)—because there was no evidence that he was ever "present at the scene of any illicit drug transaction," and thus there was no evidence that he was "directly involved" with the distribution of drugs. Morales, 108 F.3d at 1227. In so holding, we expressly rejected the notion that a defendant can be said to be "directly involved" with drugs under subsection (a)(1)(A) "simply by virtue of his involvement in money laundering." Id. at 1226 n.11. Given that § 2S1.1(a)(1) expressly incorporates subsection

9

(a)(1)(A), <u>Morales</u> thus appears to foreclose any possibility that a defendant sentenced under § 2S1.1(a)(1) can be held "accountable" for an underlying drug distribution simply by virtue of laundering money for a drug conspiracy. Rather, as <u>Morales</u> makes clear, the defendant must be personally involved in the distribution of drugs to fall under § 2S1.1(a)(1). <u>See</u> 108 F.3d at 1227.[3]

On this front, there is no evidence that Diaz-Menera was personally involved with the distribution of drugs. The Government points to just four acts by Diaz-Menera to show personal involvement: (1) he wired more than $1.5 million to Mexico, (2) he was personally responsible for transporting money to the remitters, (3) he employed others to help remit payments to Mexico, and (4) he created fake IDs.[4] (Aple. Br. 15.) None of these acts constitute personal involvement with drug distribution. Various cases—including the ones cited by the majority—demonstrate that personal involvement with distribution of drugs requires actual involvement with the drugs, like being present "at the scene of any illicit drug transaction," <u>Morales</u>, 108 F.3d at 1227, using one's home as a stash house, <u>see</u> <u>Anderson</u>, 526 F.3d at 324, accepting money for a drug transaction, <u>see</u> <u>Vela-Salinas</u>, 677 F. App'x at 231, or convincing another party to move drugs, <u>see</u> <u>United</u>

---

[3] Section 2S1.1(a)(1) would perhaps be relevant if Diaz-Menera had pled guilty to aiding and abetting the drug sales, since subsection (a)(1)(A) refers to acts and omissions "aided [or] abetted" by the defendant. U.S.S.G. § 1B1.3(a)(1)(A). Diaz-Menera did not plead guilty to anything more than a money-laundering conspiracy. (R. vol. I, at 35.) Thus, this aiding and abetting language does not provide a hook for the Government here.

[4] The only evidence in the record suggests that the fake IDs were used for money laundering, rather than for the underlying illegal drug activity. (R. vol. II, at 15 ("Diaz-Menera also admitted to using false identification cards to facilitate the money remittances.").)

States v. Sifuentes, 945 F.3d 865, 869 (5th Cir. 2019). Diaz-Menera's actions are nothing of this sort. In fact, his acts are so far removed from the drug distribution action that a money launderer could take the charged steps without even knowing that the laundered funds were derived from the distribution of drugs. A money launderer cannot be "personally involved" in the distribution of drugs if his or her involvement is so limited that he or she may not even know about the drugs. Thus, no theory of accountability can support application of § 2S1.1(a)(1).

## III.    The District Court's Error Was Not Harmless.

Having concluded that the district court erred in applying § 2S1.1(a)(1) to Diaz-Menera, the final question then is whether he was prejudiced by this error. I believe he was. Although Diaz-Menera's sentence falls at the very top of the permissible guideline range, it is harmful error for a district court to apply the wrong guideline range—even if the court happens to end up at a particular sentence that the court desires. It does not matter that the district court stated that it "would have imposed" the sentence regardless of any rulings on objections. (R. vol. III, at 127.) A district court cannot insulate its sentence from appellate review merely by preemptively stating that it would impose this sentence in all circumstances. This would frustrate our entire scheme of appellate review. Further, vacating Diaz-Menera's sentence on this basis would also add no strain to judicial resources because the majority agrees that Diaz-Menera is already entitled to resentencing due to the Government's breach of the plea agreement. (Op. 16–17.)

In sum, I believe the district court erred in sentencing Diaz-Menera under § 2S1.1(a)(1). Since there is no evidence that he was personally involved in any drug

11

distribution, our precedent dictates that he cannot be held responsible for any underlying drug distribution as a mere money launderer. And Diaz-Menera was prejudiced by this error, since the district court applied the wrong guideline range in sentencing him. I therefore respectfully dissent from the majority's decision to affirm the district court's application of § 2S1.1(a)(1). I agree that the sentence should be vacated, but would instruct the district court on remand to apply § 2S1.1(a)(2).