NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0190n.06

Case Nos. 21-5834/5836/5849

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
April 9, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| ADRIAN MITAN, | ) | DISTRICT OF KENTUCKY |
| Defendant-Appellant. | ) | |
| | ) | OPINION |

Before: CLAY, NALBANDIAN, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. Adrian Mitan participated in multiple international fraud schemes to obtain money. He pleaded guilty to conspiracy to commit bank fraud, conspiracy to commit money laundering, and conspiracy to commit a Racketeer Influenced and Corrupt Organizations Act offense. At sentencing, the district court calculated his advisory Sentencing Guidelines range and restitution sum based on the amount of loss from the conspiracies and Mitan's part in them. Mitan claims the district court's loss calculations were erroneous on both fronts. On this basis, he attacks the district court's calculation of his Sentencing Guidelines and the reasonableness of his sentence. He also challenges the restitution amount. For the reasons below, we AFFIRM.

## I.

### A. Offense Conduct

For nearly a decade, Adrian Mitan—a Romanian national—ran cybercrime operations that stole sensitive financial data, exploited vulnerabilities in banking systems, and laundered illicit

cash. As a result, federal grand juries in two states indicted him in three separate cases for his role in three conspiracies. We discuss each conspiracy in turn.

First, the "vishing" conspiracy: On November 14, 2017, Mitan was indicted in the Western District of North Carolina for conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344 and 1349. Mitan and his co-conspirators used Voice over Internet Protocol ("VoIP") technology to deceive victims into disclosing sensitive financial information. To carry out the scheme, Mitan and his co-conspirators hacked VoIP systems, installed malware, and initiated thousands of automated robocalls. These calls falsely warned victims that hackers had compromised their debit or credit card accounts and requested victims to enter sensitive account information to avoid having their accounts suspended. As a result, victims unwittingly provided debit card numbers, PINs, and CVV numbers (security codes). Then, Mitan's team cloned the debit cards and used them to withdraw cash from ATMs and make unauthorized purchases. This operation compromised at least 2,130 debit cards.

Second, the "brute-force" phishing conspiracy: On July 5, 2018, an Eastern District of Kentucky grand jury indicted Mitan for conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). This conspiracy involved Mitan and his co-conspirators phishing thousands of credit and debit card numbers. Once they had the numbers, they used some form of cryptological trial-and-error system commonly referred to as "brute force" to obtain missing security details, such as CVV codes and expiration dates. And once they compiled complete card data, Mitan's team encoded the information onto blank magnetic strips, which they then used to make clone cards. They used these cloned cards to withdraw money from victims' accounts at ATMs, then converted the stolen cash into Bitcoin (or some other form of currency) and, at Mitan's direction, transferred it overseas. Investigators linked Mitan to about 16,000 compromised credit

or debit card numbers, resulting in significant losses. For instance, over a two-day period, his network withdrew $61,000 from a single credit union using seventy-five cloned cards.

Third, the "online auction fraud" conspiracy: On July 5, 2018, an Eastern District of Kentucky grand jury indicted Mitan for conspiracy to commit a Racketeer Influenced and Corrupt Organizations Act ("RICO") offense in violation of 18 U.S.C. § 1962(d). This scheme involved an online auction scam run by the organization known as the Alexandria Online Auction Fraud Network ("AOAFN"). Under this scheme, Mitan and his co-conspirators created fake postings on eBay, Craigslist, Amazon, and other auction websites claiming to sell high-value items like automobiles. Unsuspecting buyers sent payments via prepaid cards, wire transfers, or money orders, expecting to receive their purchases. But because the items did not exist, the buyers never received the goods. To clean their profits, the conspirators funneled the funds through Bitcoin wallets, converted them into fiat currency, and laundered them through multiple accounts. In total, this scheme defrauded victims of at least $2.7 million.

**B. Plea Agreement and Sentencing**

To resolve all the charges stemming from these three separate conspiracies, Mitan entered into a global plea agreement. As part of the global deal, he agreed to consolidate all three cases in the Eastern District of Kentucky. Mitan pleaded guilty to one count under each indictment: conspiracy to commit bank fraud in the North Carolina-filed case; conspiracy to commit money laundering in one Kentucky-filed case; and conspiracy to commit a RICO offense in the other Kentucky-filed case.

In August 2021, the district court conducted a joint sentencing hearing for all three cases. The presentence report ("PSR") created two groups to calculate Mitan's base offense level: Group One accounted for the RICO and bank-fraud conspiracies, and Group Two encompassed the

money-laundering conspiracy. The "grouping guidelines" under the U.S. Sentencing Guidelines ("U.S.S.G.") instruct the sentencing court to first determine the offense level for each group by applying the offense level for the "most serious" offense within a group and then follow additional procedures to combine and arrive at one final adjusted offense level for the groups. U.S.S.G. Chapter 3, Part D. The PSR proceeded along these lines for the two groups. But the district court disagreed with this grouping. It determined that all three offenses should be grouped together— with the most serious offense, the money-laundering charge, serving as the basis for Mitan's base offense level. This process resulted in an adjusted offense level of 35 for Mitan, which the court subsequently reduced by three points for Mitan's acceptance of responsibility.

Mitan's Guidelines calculation included an 18-level enhancement under U.S.S.G. § 2B1.1(b)(1)(J) for causing losses of more than $3.5 million and less than $9.5 million. As relevant here, the PSR applied a two-point enhancement for sophisticated laundering, and another two-point enhancement reflecting that a significant part of the fraudulent schemes charged were committed overseas. U.S.S.G. §§ 2S1.1(b)(3); 2B1.1(b)(10)(B) (2018). Mitan objected to the loss amount and the sophisticated laundering enhancement both in his sentencing memorandum and at the sentencing hearing.

First, he challenged the government's use of the intended loss to calculate the total loss amount. He maintained that the government failed to show that he used many of the compromised cards it attributed to him, or that those cards were even usable. Thus, he argued, the amount attributed to those cards overstated his culpability and should not be included in his loss calculation. The court rejected Mitan's argument, finding that empirical information supported the government's estimate of a $500 loss per card. And based on that estimate, the district court

tallied the loss amount at over $6.5 million.[1]  Consequently, the court applied the 18-level sentencing enhancement under U.S.S.G. § 2B1.1(b)(1)(J) and overruled Mitan's objection.

Mitan also objected to the two-level enhancement for sophisticated money laundering under U.S.S.G. § 2S1.1(b)(3).  He argued that this enhancement improperly duplicated the two-level increase he received for conduct occurring outside the United States because both enhancements were based on the same underlying conduct.  This argument relied on the fact that the application notes to § 2S1.1 state that the use of "offshore financial accounts" are typical in sophisticated laundering schemes where the § 2S1.1(b)(3) enhancement is warranted.  U.S.S.G. § 2S1.1 cmt. n.5(A)(iv) (2018).  However, the court disagreed that the § 2S1.1(b)(3) enhancement double-counted Mitan's overseas conduct, instead ruling that Mitan's use of Bitcoin, layered financial transactions, and foreign intermediaries warranted the enhancement.  The court also observed that this was not the type of case involving offshore financial accounts that would give rise to double-counting concerns.  In the end, the district court applied both two-level enhancements.

Finally, Mitan objected to the restitution order.  Specifically, he argued that the district court did not allow him sufficient time to challenge the government's calculations, and the court granted restitution for the brute-force case when the government only sought restitution for the RICO case.  Again, the court rejected these arguments.  The district court acknowledged that the government did not specifically seek restitution for the brute-force conspiracy but still found that it had enough proof of loss to order the mandatory restitution.

---

[1] At sentencing, the government gave Mitan a 25% credit on the number of cards it attributed to him to account for invalid card numbers, which resulted in about 13,000 total credit cards.  The district court accepted this credit, but the total loss amount still exceeded $3.5 million--the triggering threshold for the 18-level sentencing enhancement.

The district court adopted the PSR's application of the overseas conduct and sophisticated laundering enhancements, as well as its application of three unchallenged two-level enhancements that increased Mitan's offense level because his offense involved ten or more victims (U.S.S.G § 2B1.1(b)(2)(A)(i) (2018)) and the use of device-making equipment and authentication features (U.S.S.G. § 2B1.1(b)(11)(A)(i), (ii) (2018)), and because Mitan was convicted of 18 U.S.C. § 1956 (U.S.S.G. § 2S1.1(b)(2)(B) (2018)). The court applied these enhancements but sustained Mitan's objection to a leadership-role enhancement. It also reduced Mitan's offense level by three to reflect his acceptance of responsibility. The court calculated the loss amount based on the intended loss, ultimately determining that Mitan had a total offense level of 32 and a criminal history category of III. This resulted in an advisory Guidelines range of 151 to 188 months' imprisonment. Then, after weighing Mitan's offense conduct, the Guidelines calculation, and the 18 U.S.C. § 3553(a) factors, the court varied downward and imposed a 140-month prison sentence. The district court also ordered Mitan to pay $75,220.51 in restitution for the brute-force conspiracy and $675,000 for the RICO conspiracy. Mitan now appeals.

## II.

Mitan challenges the reasonableness of his 140-month sentence. The reasonableness inquiry has both procedural and substantive components. *United States v. Xu*, 114 F.4th 829, 844 (6th Cir. 2024); *see also Gall v. United States*, 552 U.S. 38, 51 (2007). A challenge to a district court's calculation of a defendant's Guidelines range is a question of procedural reasonableness. *United States v. Seymour*, 739 F.3d 923, 929 (6th Cir. 2014). We review the procedural and

substantive reasonableness of a sentence for abuse of discretion. *Gall*, 552 U.S. at 51. Because Mitan raises both challenges, we address each in turn.

## A. Procedural Unreasonableness

A district court commits procedural error if it miscalculates the Guidelines range, treats the Guidelines as mandatory, neglects to consider the § 3553(a) factors, relies on clearly erroneous facts, or inadequately explains its sentence. *United States v. Gates*, 48 F.4th 463, 469 (6th Cir. 2022). Conversely, the district court imposes a procedurally reasonable sentence when it follows proper procedures and meaningfully considers the § 3553(a) factors. *United States v. Perez-Rodriguez*, 960 F.3d 748, 753 (6th Cir. 2020).

Central to Mitan's challenge is the district court's calculation method for the loss amount to be applied under U.S.S.G. § 2B1.1. We review the district court's methodology de novo. *United States v. Agrawal*, 97 F.4th 421, 436 (6th Cir.), *cert. denied*, 145 S. Ct. 258 (2024). But we review its factual findings, including the application of the methodology to ultimately determine the loss amount, for clear error. *Id.*

### i. Intended Loss

Mitan claims the district court erred in using intended loss instead of actual loss to determine loss amount under U.S.S.G. § 2B1.1. He argues that the court wrongly deferred to the § 2B1.1 commentary's definition of "loss," when it should have focused on actual loss since that is the only reasonable construction of the term "loss." (ECF 79, Appellant's Br. at 22). The district court estimated the loss amount based on the number of all compromised credit and debit card numbers, rather than just the actual fraudulent transactions. Binding precedent supports the district court's approach.

For theft and fraud convictions, § 2B1.1 provides that a defendant's offense level should be increased "in incremental amounts based on the 'loss' from the offense." *United States v. You*, 74 F.4th 378, 397 (6th Cir. 2023) (quoting *United States v. Riccardi*, 989 F.3d 476, 481 (6th Cir. 2021)). True, the main text of § 2B1.1, as it appeared at the time of Mitan's sentencing, did not define "loss."[2] But the commentary explained that, generally, loss is the "greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A) (2018). And it defined "intended loss" as "the pecuniary harm that the defendant purposely sought to inflict," which "includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* § 2B1.1 cmt. n.3(A)(ii)–(iii).

At the time of Mitan's sentencing, persuasive caselaw supported adoption of the commentary definition. *See, e.g.*, *United States v. Murphy*, 815 F. App'x 918, 922 (6th Cir. 2020). And since *Murphy*, we have expressly embraced the commentary definition of loss to determine a defendant's Guidelines range. *See You*, 74 F.4th at 396–98; *see also United States v. Smith*, 79 F.4th 790, 797 (6th Cir. 2023); *United States v. Tellez*, 86 F.4th 1148, 1150–51, 1154 (6th Cir. 2023); *United States v. Kennert*, No. 22-1998, 2023 WL 4977456, at *3 (6th Cir. Aug. 3, 2023), *cert. dismissed*, 144 S. Ct. 1090 (2024). Mitan recognizes that we will "likely . . . rely on precedent." (ECF 79, Appellant's Br. at 21). Indeed, we are bound to do so. Mitan provides no Supreme Court case mandating a departure from *You*, nor has this court sitting en banc overruled *You*. *See United States v. Moody*, 206 F.3d 609, 615 (6th Cir. 2000) ("[This court's] earlier determination is binding authority unless a decision of the United States Supreme Court mandates modification or this Court sitting en banc overrules the prior decision"). Therefore, because the

---

[2] A November 2024 amendment to the Sentencing Guidelines. moved the definition of "loss" from the commentary to the main text of § 2B1.1. *See* U.S.S.G. amend. 827. Mitan's sentencing took place in August 2021, thus predating Amendment 827. Still, the district court properly began its "sentencing analysis with the Guidelines in effect at the time of the offense and use[d] them to calculate the sentencing range." *Peugh v. United States*, 569 U.S. 530, 549 (2013). And those same Guidelines—which define loss only in the commentary—anchor our appellate review process. *Id.*

Guidelines in effect at the time of Mitan's sentencing and our own binding case law supported the district court's approach, his first challenge on this basis fails.

### ii. Calculating Intended Loss

Even if using intended loss was not erroneous, says Mitan, the district court's loss calculation, based on its $500-per-card estimate, was mostly speculative. However, Mitan "carr[ies] the heavy burden of persuading this Court that the evaluation of the loss was not only inaccurate, but was outside the realm of permissible computations." *United States v. Nicolescu*, 17 F.4th 706, 720 (6th Cir. 2021) (quoting *United States v. Jackson*, 25 F.3d 327, 330 (6th Cir. 1994)). Mitan primarily argues that the district court arrived at its estimate using only the average loss from confirmed fraudulent transactions while failing to account for cards with unknown usage. This method of computing loss, he reasons, contained too much unknown information to be considered acceptable.

As a corollary to this point, he contends that the district court improperly extrapolated the same per-card loss to all compromised cards, including those for which the government presented no evidence of fraudulent use. He further asserts that even if the district court's calculation method was permissible, the court failed to consider his non-frivolous argument that proceeding in this fashion "artificially inflated" his responsibility level. (ECF 79, Appellant's Br. 27).

First, as to the method for arriving at intended loss, a district court's loss estimate need not be exact. "Because of the difficulties often associated with attempting to calculate loss in a fraud case," the court need just reasonably estimate the loss based on a preponderance of the evidence. *United States v. Ellis*, 938 F.3d 757, 760 (6th Cir. 2019) (citation omitted). We defer to the district court's loss calculation so long as it is "plausible on the record as a whole." *United States v. Estrada-Gonzalez*, 32 F.4th 607, 614 (6th Cir. 2022).

The record shows that the court reasonably estimated the loss amount using data from actual fraudulent transactions—not speculation. Mitan relies on *Riccardi* to argue that a $500 minimum loss for each card is arbitrary and therefore inappropriate. 989 F.3d 476. But unlike in *Riccardi*, the government here did not blindly rely on the Guidelines commentary to arbitrarily reach the $500 amount. Instead, the government introduced evidence at sentencing from financial institutions affected by Mitan's scheme. That evidence demonstrated that the average loss per card ranged from about $500 to $648.

Second, Mitan's contention that the district court failed to address his argument that its calculation method falsely expanded his responsibility level lacks merit. Regardless of whether we review this claim for abuse of discretion as Mitan advocates, or for plain error as the government proposes, it fails. While Mitan couches this argument as discrete from his challenge to the district court's intended-loss approach, we detect scant distinction because, at its core, it remains an attack on the methodology for attributing fault. And, on that score, the district court gave ample reasoning for its assessment. For one, the district court thoroughly reviewed Mitan's culpability, looking at both the "length and degree of his participation." (Case No. 18-5, R. 177, PageID 1082). In the end, the district court found that the intended loss amount was a "conservative estimate"—that it could still "go higher and feel pretty confident about it." (*Id.*, PageID 1092). Indeed, contrary to Mitan's inflation concerns, the district court sought to avoid overstatement by applying the low end of the government's estimate. The district court also considered the possibility of accounting for fewer credit cards. But the court observed that even if it assumed that more than half of those card numbers were invalid, the resulting calculation still would have reached the $3.5 million loss amount that triggers an 18-level increase under the Guidelines. From these observations, it is evident that the district court "listened to each [of

Mitan's] argument[s]," "considered the supporting evidence," was "fully aware" of Mitan's circumstances and took "them into account" in deciding on an appropriate sentence. *Rita v. United States*, 551 U.S. 338, 358 (2007).

Because the evidence supported the district court's findings, the district court did not clearly err in making its intended-loss calculation. Further, the court fully considered the parties' arguments in arriving at Mitan's below-guidelines sentence.

### iii. Sophisticated Laundering

Mitan's final challenge to his Guidelines calculation concerns the district court's application of two enhancements—one for conduct outside the United States and another for sophisticated laundering. U.S.S.G. §§ 2B1.1(b)(10)(B), 2S1.1(b)(3) (2018). He argues that the court impermissibly double-counted his conduct by applying both enhancements for the same underlying actions. But this argument is unavailing because each enhancement penalized distinct harms. The first enhancement accounted for where Mitan committed the offense (Romania). And the second addressed how he executed the laundering scheme (through layered transactions and cryptocurrency obfuscation).

Sentencing courts may apply a two-level enhancement when a defendant committed a "substantial part of a fraudulent scheme" from outside the United States. U.S.S.G. § 2B1.1(b)(10)(B). A separate enhancement under § 2S1.1(b)(3) applies when a defendant engages in "sophisticated laundering," like when he uses layered financial transactions to disguise the origin of criminal proceeds. *See* U.S.S.G. § 2S1.1(b)(3) cmt. n.5 (2018); *see also United States v. Hubbard*, 843 F. App'x 667, 674 (6th Cir. 2019). Importantly, courts may apply multiple enhancements if the enhancements serve distinct sentencing purposes. *Compare United States v. Myers*, 854 F.3d 341, 357–58 (6th Cir. 2017) (upholding the application of two

distinct enhancements when different conduct triggered each one), *with United States v. Mehmood*, 742 F. App'x 928, 943 (6th Cir. 2018) (remanding to the district court with instructions to address the propriety of applying the sophisticated-laundering enhancement and the fraudulent scheme sophisticated-means enhancement, given the Guidelines' admonition against applying the enhancements when the same conduct forms the basis of each enhancement).

Mitan does not deny that he operated his fraudulent scheme from Romania. Moreover, he coordinated with foreign actors, used offshore cryptocurrency exchanges, and routed funds through international accounts to obscure the origins of illicit proceeds. This conduct amounted to a "substantial part" of the scheme and was sufficient to apply § 2B1.1(b)(10)(B).

Separately, the district court also correctly applied U.S.S.G. § 2S1.1(b)(3) because Mitan employed sophisticated laundering techniques. These techniques included converting stolen funds into Bitcoin, cycling cryptocurrency through multiple wallets, and cashing out through foreign-based financial intermediaries. Employing such methods created multiple layers of financial obfuscation, making it difficult to trace the movement of illicit funds. And we have upheld the sophisticated-laundering enhancement when defendants have engaged in multi-step financial transactions designed to evade detection. *See United States v. Vela-Salinas*, 677 F. App'x 224, 231 (6th Cir. 2017). So too here. Mitan's repeated use of digital currency, layered transfers, and foreign intermediaries comfortably fits within the scope of conduct warranting the enhancement. As such, the district court properly imposed both enhancements because they addressed separate aspects of Mitan's conduct.

Mitan has not shown that the district court clearly erred in any of its factual findings underpinning its Guidelines applications. Nor has he shown that the court employed speculation to arrive at a loss amount. Rather, the court faithfully applied the Guidelines, consistent with

binding precedent, to determine loss amount and to assess the applicability of the challenged sentencing enhancements. Consequently, Mitan's challenge to the procedural reasonableness of his sentence based on any purported misapplication of the Guidelines fails.

### B. Substantive Unreasonableness

Mitan also attacks the substantive reasonableness of his sentence, asserting that 140 months' imprisonment exceeds what was necessary to achieve the goals of sentencing and creates an unwarranted sentencing disparity. A sentence is substantively reasonable if it is "proportionate to the seriousness of the circumstances of the offense and offender and sufficient but not greater than necessary, to comply with the purposes of [18 U.S.C.] § 3553(a)." *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008) (citation and internal quotation marks omitted). To assess substantive reasonableness, we examine the "totality of the circumstances, including the extent of any variance from the Guidelines range." *Gall*, 552 U.S at 51. While we presume on appeal that a within-Guidelines sentence is substantively reasonable, a defendant can rebut this presumption by showing that "a district court chose a sentence arbitrarily, ignored pertinent § 3553(a) factors, or gave unreasonable weight to any single factor." *Xu*, 114 F.4th at 846–47 (quoting *United States v. Miller*, 73 F.4th 427, 431 (6th Cir. 2023)). Notably, however, defendants challenging the substantive-reasonableness of a below-guidelines sentence bear a heavy burden. *United States v. Nunley*, 29 F.4th 824, 834 (6th Cir. 2022).

Here, the district court varied downward from the Guidelines range after evaluating the § 3553(a) factors. Yet Mitan argues that the court should have imposed an even greater downward variance because of its purported error in calculating the Guidelines range—specifically, its loss-amount determination. But as discussed, the district court did not err in that regard and properly considered Mitan's concerns about overstated culpability stemming from the loss amount

calculation. Mitan does not offer any other viable basis for us to conclude that the district court abused its discretion in declining to impose a larger variance.

Mitan resists this conclusion, insisting that his sentence creates an unwarranted sentencing disparity compared to his co-conspirators, who received lower sentences. But sentencing courts need not impose strict proportionality among co-defendants, particularly when their culpability levels and criminal histories differ. *United States v. Conatser*, 514 F.3d 508, 522 (6th Cir. 2008). And the district court expressly found that Mitan was not similarly situated to his co-defendants. For instance, the court noted that every other co-conspirator who had been sentenced had a criminal history category I. Mitan's more extensive criminal history, on the other hand, placed him in category III. The court also meaningfully reviewed the remaining § 3553(a) factors, emphasizing that Mitan's offenses were sophisticated, repeated, and international in scope. This, the court reasoned, required a deterrent sentence. Because the district court thoroughly explained its reasoning and imposed a sentence that served the goals of punishment and deterrence, we detect no abuse of discretion. *See Gall*, 552 U.S. at 59–60 (2007). Given this conclusion, Mitan has not demonstrated that his sentence was procedurally or substantively unreasonable.

## III.

Mitan's final challenge is to the district court's restitution order. Consistent with the terms of the plea agreement, the court resolved restitution at sentencing rather than at a separate restitution hearing. Six months before the sentencing, the court reminded the parties of its plan to resolve restitution at the sentencing hearing. Then, nearly two weeks before the hearing, the government filed a restitution brief seeking approximately $2.7 million for Mitan's role "on behalf, and in furtherance, of the RICO conspiracy including actively defrauding innocent victims." (Case

No. 18-5, R. 154, PageID 559). Mitan opposed the request, arguing that the district court should limit his restitution to $10,801 because of his minimal role in the RICO case.

At sentencing, the government presented evidence establishing the total loss suffered by RICO victims as well as victims of the brute-force conspiracy. The district court accepted this evidence and ordered Mitan to pay $75,220.51 for the brute-force victims and $675,000 in restitution for the RICO victims. Mitan challenges both findings. We review whether restitution is permitted de novo and the amount of restitution for abuse of discretion. *United States v. Hills*, 27 F.4th 1155, 1202 (6th Cir. 2022).

## A. Brute-Force Conspiracy

First, Mitan argues that the district court erred in ordering restitution for the brute-force conspiracy. He claims that the government never requested restitution for that case in its filings, so the district court granted it *sua sponte*. This lack of notice, he contends, deprived him of an opportunity to prepare arguments in opposition. Mitan does not challenge the accuracy of the $75,220.51 figure. Instead, both at sentencing and on appeal, he objects only to the way the court imposed the amount. At its root, Mitan's concern is one of due process. *See United States v. Sawyer*, 825 F.3d 287, 298 (6th Cir. 2016). And although the government's briefing at sentencing did not expressly request restitution for the brute-force case, Mitan still had both general and specific notice that restitution for that conspiracy might apply.

The Mandatory Victims Restitution Act ("MVRA") requires restitution when a victim suffers pecuniary loss or when a Title 18 offense involves fraud. 18 U.S.C. § 3663A(c)(1)(A)(ii). Restitution under the MVRA is to be "issued and enforced in accordance with section 3664." 18 U.S.C. § 3663A(d). Section 3664 requires that the PSR include, "to the extent practicable," the loss calculation as to each victim, as well as any restitution owed pursuant to a plea agreement.

*Id.* § 3664(a). And if the victims' losses are still not ascertainable ten days before sentencing, the government is to inform the sentencing court, so that the court can employ several procedural options to obtain the evidence necessary to determine the restitution amount. *Id.* § 3664(d)(5); *See United States v. Bogart*, 576 F.3d 565, 569 (6th Cir. 2009).

Here, the probation officer was unable to ascertain a restitution amount in the PSR. The parties had set a deadline of August 1, 2021, for the government to submit its motion for restitution, but the government missed the deadline. Still, two weeks before Mitan's sentencing, the government submitted a supplemental brief requesting approximately $2.7 million in restitution. And in accordance with section § 3664(a), the government submitted a 15-page itemized spreadsheet of victims who suffered losses from the RICO conspiracy. 18 U.S.C. § 3664(a). The district court accepted the government's late filing and confirmed it intended to address the mandatory restitution at Mitan's sentencing. A few days later, the government filed its sentencing memorandum, which included tables showing that First Technology Federal Credit Union (FTFCU) lost $60,672.98 and U.S. Bank lost $12,371.48 from the brute-force conspiracy.

The details contained in the government's filing satisfied the district court that it had the information necessary to determine restitution, and it did not abuse its discretion in relying on that information. Mitan's argument that he lacked sufficient notice is meritless. To begin, each of Mitan's convictions requires mandatory restitution under the MVRA. Beyond that, the express terms of Mitan's plea agreement put him on notice of this fact. For instance, Mitan agreed to pay restitution "in an amount determined at sentencing." (Case No. 18-5, R. 84, PageID 285). And that same plea agreement covered all three cases, including the brute-force conspiracy. This means that Mitan had over twenty months to prepare for a restitution determination that he knew was mandatory under the MVRA. In fact, the plea agreement's statement of facts—to which Mitan

stipulated—went as far as expressly identifying FTCFU as a victim of the brute-force conspiracy. The statement of facts also stated that the credit union suffered a $61,000 total pecuniary loss. And the statement of facts further acknowledged that Mitan obtained about 16,000 unique credit card numbers from customers of various financial institutions. Thus, not only did Mitan receive notice that the brute-force conspiracy would be part of the restitution calculation, but he also had a starting point to reference.

Likewise, Mitan was aware of specific loss amounts regarding the brute-force victims. The government's sentencing memorandum, submitted eleven days before the hearing, disclosed specific loss amounts for two victims: FTFCU and U.S. Bank. Thus, Mitan was on notice of at least $73,044.46 in restitution. All this information came to a head at sentencing when the government confirmed that three financial institutions suffered a combined $75,220.51 in losses due to the brute-force phishing conspiracy. A government witness testified about these losses. Mitan even cross-examined the witness on the loss amounts. And although the court acknowledged that the government provided some of this information after the court-imposed deadline, Mitan never sought a continuance to develop his arguments.

In short, Mitan had sufficient notice and an opportunity to contest restitution for the brute-force conspiracy. He knew restitution was mandatory under the MVRA; his plea agreement referenced losses tied to the brute-force conspiracy; the government provided specific financial loss figures before sentencing; and Mitan cross-examined the government's witness on the issue. *See Sawyer*, 825 F.3d at 298–99 (finding no error in ordering restitution when the defendant had notice and an opportunity to contest restitution at sentencing). In fact, in his opposition to the government's restitution brief, Mitan cited a task force agent's affidavit on calculated forfeiture directly resulting from the brute-force case. Because the brute-force restitution order aligns with

statutory requirements and is supported by the record, we find no basis to disturb the district court's decision.

**B. RICO Conspiracy**

Finally, Mitan argues that the $675,000 restitution order in the RICO conspiracy far exceeds his responsibility. He claims that the government records show he personally gained only $10,801 from the fraudulent scheme so his restitution should not exceed that amount. This argument fails. Restitution compensates victims for their losses; it is not dependent on the defendant's profit. *United States v. Kilpatrick*, 798 F.3d 365, 388 (6th Cir. 2015). And courts may hold each defendant jointly and severally liable for the entire conspiracy-related restitution amount. *United States v. Williams*, 612 F.3d 500, 510 (6th Cir. 2010); 18 U.S.C. § 3664(h).

The district court did not impose the government's full $2.7 million restitution request. Instead, it apportioned Mitan's share based on his active involvement. In that regard, the court considered the fact that Mitan only participated in part of the conspiracy's thirty-month duration. Since the conspiracy caused an average monthly loss of $45,000, the court multiplied that figure by fifteen months, leading to the $675,000 restitution order. Mitan objected, claiming he left the conspiracy earlier than the court found. But the district court relied on evidence showing his continued involvement and overruled his objection. He directs us to no evidence suggesting the court clearly erred in its factual findings concerning the duration of his involvement. So this argument falls flat.

The district court could have held Mitan responsible for the full $2.7 million loss. Instead, it limited Mitan's restitution based on his documented participation. The court's decision rested on clear evidence of Mitan's role, the monthly losses caused by the conspiracy, and legal precedent

supporting joint liability in fraud cases.  Because the restitution amount comports with established law and factual findings, the district court did not abuse its discretion in awarding it.

**IV.**

We AFFIRM.